## Louisville & Nashville R. R. Co. v. Scott.
## Louisville & Nashville R. R. Co. v. Clark.

(Decided January 12, 1911.)

Appeals from Hart Circuit Court.

1. Railroads—Liability for Misinformation Furnished by a Depot Agent to Passenger.—An agent of a railroad company in charge of one of its passenger stations at which tickets for the transportation of passengers are sold, has authority on behalf of the company to agree with and furnish informat'on to persons who desire to become passengers, that its train not scheduled to stop at a designated station will stop there for the purpose of permitting them to get on or off, and the company will be bound by his representations, unless it is shown that the person to whom he made them knew that they were not within the power or authority of the agent, or unless the ticket upon its face furn'shes advice sufficient to put a reasonably careful and prudent person upon notice that the information furnished or the agreement made by the agent is incorrect or in excess of his authority.

2. Powers of Depot Agent.—When a railroad company has established a place on its line of railroad, or elsewhere, at which tickets may be bought for transportation upon its line of road, it thereby invests the agent in charge of its business with the implied authority to furnish all reasonable information relating to the transportation of passengers and concerning the movement of passenger trains, and with the power to bind it by agreements made by him or information furnished by him within the line of his duty. And it is within the line of his duty to give information and make representations in reference to the rights of passengers holding tickets that he sells to them. The public has the right to go to such an agent for information concerning the movement of trains upon which they desire to take passage and they have the right to rely upon the statements made by him concerning such matters.

3. Railroads—Liabilities for Information Furnished by Depot Passenger Agent.—Where a passenger agent of a railroad company agreed that a certain train would stop at a designated place, and on the faith of this information the traveler purchases a ticket and takes passage on the train inquired about, he may recover damages from the company for the failure of the train to stop at the designated station and let him off.

4. Railroads—Rules and Regulations for the Operation of Trains.—Railroad companies have the right to establish reasonable rules and regulations for the operation of their trains, and within reasonable limitation to designate the stations at which they will stop to receive and discharge passengers. And if a traveler in the the absence of an agreement or arrangement, or without acting upon information furnished by the company, takes passage upon a train that is scheduled not to stop at a designated station, he cannot maintain an action if it fails to stop at such station.

5. Railroads—Measure of Damage for the Wrongful Ejection of Passenger.—A passenger who is wrongfully ejected from a train is entitled to recover compensatory damages; and in addition thereto, exemplary damages, if his ejection is accompanied with insult or abuse on the part of the train employes or their conduct or manner is violent or threatening.

6. Right of Members of a Party to Exemplary Damages.—Where, in the wrongful ejection from a train of a number of passengers at the same time, the conductor acts in an abusive, insulting or threatening manner towards some of them, only those to whom he was insulting, abusive or threatening have the right to recover exemplary damages. Others of the party towards whom his conduct was not objectionable are only entitled to compensatory damages.

7. Passenger—Rejection of.—Whether the act of the conductor in pushing a passenger out of a car or from the train entitle the passenger to exemplary damages depends very largely upon the circumstances surrounding the parties at the time. Under some circumstances it might be rude and offensive to push a passenger who was being ejected by the conductor; under other circumstances, the conductor might not be using more force than was reasonably necessary to eject the passenger from the train. A conductor in ejecting a passenger has the right in a decent orderly way to take hold of the person of the passenger for the purpose of requiring him to leave the train, if he refuses otherwise to do so.

8. Instructions—Separation of Compensatory and Exemplary Damages.—In cases in which trial courts deem it proper to instruct the jury to allow exemplary as well as compensatory damages, the jury should be instructed to find separately the amount of damages awarded for each.

9. Damages—Remitter.—When the amount allowed for compensatory and exemplary damages is separately stated, and this Court is of the opinion that exemplary damages should not be awarded, it may direct this item of damage to be remitted and direct a judgment to be entered for the amount allowed as compensation.

WATKINS & CARDEN, SIMS & RODES, BENJAMIN D. WARFIELD and CHARLES H. MOORMAN for appellants.

M'CANDLESS & LARIMORE, H. W. CURLE and S. M. PAYTON for appellees.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

These two appeals present law and facts growing out of the same transaction, and will be disposed of together.

The appellees, who are colored people, live at Horse Cave, a station on the appellant company's line of road. They, and several others, in September, 1909, desiring to attend a base ball game at Bowling Green, also on appellant's line of road, selected Shelby Beard and others of their friends to make arrangements with the railroad company for transportation. The schedule of the passenger trains between Bowling Green and Horse Cave that made regular stops at Horse Cave would not enable the party to go to Bowling Green, and after seeing the

game, return on the same day, and so Shelby Beard and the others requested the depot and ticket agent of the company at Horse Cave to have the train known as No. 2 that passed through Bowling Green about 10 o'clock each night stop at Horse Cave and let the party off. They knew that Horse Cave was not a regular stopping place for this train, and that it only occasionally stopped there to receive and discharge passengers. According to the testimony of Beard and others, the agent at Horse Cave told them that if they would get up a party of as many as fifteen he would have train No. 2 stop and let them off. Acting, as they claim, upon this information, a party of more than twenty was made up, and all of them went to Bowling Green on the morning train, and on that night they got on train No. 2 at Bowling Green for the purpose of returning to Horse Cave. About eleven o'clock at night when this train reached Cave City, a station four miles from Horse Cave, at which it was in the habit of stopping, the conductor required the entire party to leave the train, and they were obliged to and did walk from Cave City to their homes at Horse Cave. To recover damages for their alleged wrongful ejection, the appellees brought these suits, setting out in their petitions substantially the facts before stated, and the further fact that the conductor in requiring them to leave the train at Cave City behaved towards them in a rude, violent and insulting manner. They also averred that the appellant company, for the purpose of intimidating them, falsely and maliciously had them and other members of the party arrested upon the charge of having committed a breach of the peace on the train and at the station in Cave City, and that upon a trial of this charge they were acquitted. Each of them asked damages in the sum of $5,100.

In its answer, the company after traversing the averments of the petition, pleaded (1) that the agent at Horse Cave had no authority to agree with Shelby Beard or others that he would have train No. 2 stop for the purpose of letting them off at Horse Cave, (2) that they were permitted to get on this train at Bowling Green under an agreement with the conductor that they would all leave the train at Cave City, (3) that it had no connection with, and did not instigate, the arrest or prosecution of any of the parties for disturbing the peace at Cave City.

Upon a separate trial before a jury the damages in

favor of appellee Mamie Scott were assessed at $250, and the damages in favor of appellee Tiny Clark at $500.

We are asked to reverse the judgments entered upon these verdicts for error of the court in refusing to direct a verdict in favor of the company—for error in giving instructions—in admitting incompetent evidence, and because the damages allowed are excessive.

But, before taking up the errors assigned, it is proper to state that the agent denied that he agreed he would have train No. 2 stopped and says that he told Shelby Beard, the leader of the party, to see the agent and telegraph operator at Bowling Green and try to procure one of them to get an order to stop the train, as he had no authority to stop it and could not get an order to have it done. It also appears that Shelby Beard did go to see the agent as well as the operator at Bowling Green, but neither of them made any effort to get an order to have the train stopped. When the train came into Bowling Green, and the party went to get on, the conductor testifies that he asked them where they were going and they said ''Horse Cave,'' and he re-replied ''this train doesn't stop at Horse Cave and you cannot get on,'' and they then said ''Well, we will go to Cave City.'' And with the understanding that the party would leave the train at Cave City, he permitted them to get on. While members of the party testify that they did not tell the conductor they would get off at Cave City, and that they got on the train with the belief and expectation that it would stop and let them off at Horse Cave. It is also shown that Shelby Beard had one ticket for the entire party, from Horse Cave to Bowling Green, and return, and that the conductor took up this ticket. We may add that the evidence upon this point leaves the impression that the conductor knowing that his train would stop at Cave City, permitted the party to get on, believing that they would get off at Cave City, and we may also observe that Shelby Beard and the well behaved members of the party did get off at Cave City without objection or resistance.

Taking up now the question of the authority of the agent at Horse Cave to make the agreement or arrangement relied upon by appellees that they could return to Horse Cave from Bowling Green on train No. 2, we may say at the outset that there was sufficient evidence to authorize a submission of the case on this issue to the jury and to sustain a finding that such an agreement was

made. But, admitting this, the question is raised by counsel for the railroad company that the agent did not have authority to make any agreement or arrangement of this character, that was binding upon his principal, the company. If he did not, of course no cause of action against the company can be founded upon a breach of it, nor could the company be held responsible for failing to stop this train at Horse Cave in the absence of an agreement with some person authorized to agree that it would stop, because railroad companies have the right to establish reasonable rules and regulations for the operation of their trains, and within reasonable limitations to designate the stations at which they will stop to receive and discharge passengers. And if a traveler, in the absence of an agreement or arrangement, or without acting upon information furnished by some authorized agent of the company, takes passage upon a train that is scheduled not to stop at the station to which he desires to go, he cannot maintain an action if it fails to stop at such station, because, unless acting under an agreement or arrangement or upon information furnished by the company, the traveler must inform himself of the arrival and departure of trains and the places at which they will and will not stop. It follows from this that although appellees boarded this train at Bowling Green with the purpose of getting off at Horse Cave, a station at which it was not scheduled to stop, they could not unless acting under an arrangement with or upon information furnished by the agent at Horse Cave, recover damages for the failure to carry them to Horse Cave and permit them to leave the train. There is no effort made to hold the company liable upon the ground that the conductor permitted them to board the train knowing that they had a ticket for Horse Cave, which he took up, the cause of action being rested entirely upon the agreement made with the agent at Horse Cave. Coming now to the sufficiency of the agreement between the agent and this party, or the information furnished by him to bind the company, we have no doubt that an agent of a railroad company in charge of one of its passenger stations at which tickets for the transportation of passengers are sold has authority on behalf of the company to agree with and furnish information to persons who desire to become passengers, that a train not scheduled to stop at a designated station will stop there for the purpose of permitting them to get on or off,

and that the company will be bound by his representations, unless it is shown that the person with whom he made the agreement or to whom he gave the information knew that it was not within the power or authority of the agent to make the agreement or give the information or unless the ticket upon its face furnished advice sufficient to put a reasonably careful and prudent person upon notice that the information furnished or the agreement made by the agent was incorrect or in excess of his authority. But as this phase of the question is not here, we need not express any opinion as to the rights of a passenger when there is conflict between the information given or the agreement made, and that furnished by the ticket. Of course, it is elementary that an agent has no authority to bind his principal, unless he is acting within the apparent scope of his authority, but we think that when a railroad company has established a place on its line of railroad, or elsewhere, at which tickets may be bought for transportation upon its line of road, it thereby invests the agent in charge of its business, so far as the public is concerned, with the implied authority to furnish all reasonable information relating to the transportation of passengers, and concerning the movement of passenger trains, and with the power to bind it by any agreements made by him or information furnished by him, within the line of his duty. And we are also of the opinion that it is within the line of his duty to give information and make representations in reference to the rights of passengers holding tickets that he sells to them. The public has the right to go to such an agent for information concerning the movement of trains upon which they desire to take passage, and they have the right to rely upon the statements made by him concerning such matters. It would be a curious state of affairs if an agent having the express authority to sell tickets for transportation to and from different points did not also have the authority to give reasonable and proper information concerning the trains upon which such tickets might be used and the places at which trains would stop to receive and discharge passengers holding tickets sold by him. And so, when the ticket agent of a railroad company agrees with or informs a person desiring to become a passenger that the ticket will be good on certain trains, or that certain trains upon which it may be used will stop at a designated place to let such person on or off, the company

will be bound by his agreements or representations or by the information furnished by him in the absence of knowledge upon the part of the purchaser of the ticket that the agent had no authority to make such an agreement or that the information given was incorrect, and when the ticket does not contain agreements or conditions by which the passenger's rights are to be determined. It may be true that the agent must submit the request for a change in schedules, or for authority to stop a train at a place it is not scheduled to stop, to his superiors and obtain their conesnt, but this is a matter between the railroad company and its agent. If its agent having the implied authority to act for it makes agreements or representations in violation of its rules, or in disobedience of its orders, or fails or neglects to procure the necessary authority to do what he agreed or represented should be done, it is the fault of the agent and not the passenger, and the company as between the passenger and it must suffer the consequences of its agent's negligence or want of power. P. C. C. & St. L. R. Co. v. Reynolds, 55 Ohio State, 370, 60 Am. St. Rep., 706; Atkinson v. Southern R. Co., 114 Ga., 146; 55 L. R. A., 223; Kansas City, et al., R. Co. v. Little, 66 Kansas, 378; 61 L. R. A., 122; Hutchinson v. Southern R. Co., 140 N. C., 123; 6 Am. & Eng. Annotated Cases, 22; Hutchinson on Carriers, 3d Ed., Vol. 2, section 1060.

The next question to be considered is, did the court err in instructing the jury that they might allow punitive or exemplary damages? Whether this instruction was proper or not depends upon the manner in which the appellees were ejected from or required to leave the train at Cave City. That the company was liable to them for compensatory damages, if the jury believed the agreement heretofore mentioned was made with the ticket agent, we have already decided. This measure of damages they were entitled to on account of the mere act of ejection, without reference to how it was accomplished. But, punitive damages should not have been allowed, unless the conductor used more force than was necessary to require appellees to leave the train, or unless his conduct, manner or language was insulting, or abusive, or violent or threatening, or his behavior manifested a wanton and reckless disregard of the rights of appellees or a disposition to oppose or humiliate them. L. & N. R. Co. v. Ballard, 88 Ky., 159; Memphis, et al. R. Co. v. Nagel, 97 Ky., 9; Southern R. Co.

v. Hawkins, 121 Ky., 415; L. & N. R. Co. v. Fowler, 123
Ky., 450; L. & N. R. Co. v. Summers, 133 Ky., 684; Cin-
cinnati, et al. R. Co. v. Strosnider, 121 S. W., 971.

The court in each case instructed the jury that: "If
they believe from the evidence · that the defendant's
agents or servants · in charge of said train assaulted
plaintiff or brandished or menaced her with a pistol, or
wilfully abused or threatened her in a violent or insult-
ing manner in the presence of the other passengers, they
may find such additional damages by way of smart
money as they may deem proper."

If the evidence justified the giving of this · instruc-
tion, it is not objectionable. It appears from the evi-
dence that when the train reached Cave City the con-
ductor told this party that they must get off. In obedi-
ence to his request, some of them did get off, others re-
fused, saying that their ticket entitled them to be carried
to Horse Cave and they were not going to leave the train
at Cave City. The efforts of the conductor to force
those who declined to leave the train to get off, created
considerable confusion and disturbance. And several
of them testify that he used very abusive and insulting
language, and in addition to this drew a pistol and
threatened to shoot some of them. But, assuming that
the conductor acted in the manner indicated, we do not
think his conduct entitled these appellees to punitive
damages unless his manner or conduct towards them
was insulting, threatening or abusive. They are not en-
titled to recover for insults or humiliation put upon
other passengers. Their rights of recovery should be
confined to what happened to them. It would be mani-
festly unjust to award these appellees exemplary dam-
ages on account of the misconduct of the conductor to-
wards other passengers, as those other passengers may
have suits against the company to recover damages for
the injuries to them. Limiting then the right of appel-
lees to exemplary damages to their treatment by the
conductor, we find that Mamie Scott testifies that when
the conductor requested the party to leave the train,
she got off in obedience to his orders. She does not say
that before or while she was alighting from the train
the conductor said or did anything to her that was rude,
offensive, insulting or threatening. But, it appears that
after she had left the train and while she was standing
on the station platform, the conductor and other mem-
bers of the party became involved in a controversy or

difficulty concerning their removal from the train, and that she then went back on the steps or platform of the train for the purpose of interfering in behalf of one of her friends, and that the conductor then pushed her back against the door of the car. As her right to recover exemplary damages is rested entirely upon the fact that the conductor used more force than was necessary and treated her in a rude and insulting manner in ejecting her from the car, it is manifest from her testimony that she did not bring herself within the averments of her pleading or the rule that entitles passengers to recover damages of this character. What the conductor did or said to her after she had left the train and had ceased to be a passenger, and at a time when she was not entitled to the protection afforded passengers, does not entitle her to recover punitive damages.

Tiny Clark testifies in substance that when the train arrived at Cave City the conductor told them to get off and that she said she didn't intend to get off and would make the conductor pay for putting her off, and that he said: That was all right; and pushed her down the steps; that he didn't say anything else to her.

Whether the act of the conductor in pushing a passenger out of a car or from the train would entitle the passenger to exemplary damages depends very largely upon the circumstances surrounding the parties at the time and the manner in which the force was used. Under some circumstances it might well be considered rude and offensive to push a passenger, who was being ejected down the steps or at all. Under other circumstances the conductor might not be using more force than was reasonably necessary to eject the passenger from the train. If the conductor has the right to eject a passenger, then he has the right in a decent orderly way to take hold of the person of the passenger for the purpose of requiring such passenger to leave the train, if the passenger refuses otherwise to do so. And so we are of the opinion that under the evidence the conduct of the conductor in ejecting Tiny Clark from the train was not so rude or offensive as to authorize the recovery of more than compensatory damages. The conductor on this occasion was confronted by an unusual situation. Acting in the line of his duty he had the right to require these people to leave the train. Some of them willingly did so, others refused, and at least some of those who refused were disorderly and under the influence of liquor. If, in an

effort to require those who were disorderly or under the influence of liquor or who refused to leave the train, the conductor was obliged to take hold of them, the company should not be punished by the allowance of smart money for his acts in so doing. As the appellees, although entitled to compensation, were not entitled to exemplary damages, these cases must be reversed, because we are unable to say how much the jury awarded as compensation and how much as smart money. If the jury had separated their findings of compensatory and exemplary damages, and the sum awarded for compensation was not excessive, we would yet reverse the judgment, but would feel authorized to direct a remitter of the amount awarded as smart money, leaving the remainder of the judgment to stand. And this condition brings sharply to our attention the fact that it would be advisable and proper for trial courts in all cases in which compensatory as well as exemplary damages are deemed by them allowable to instruct the jury to find separately the damages awarded for each. This practice, although it may be regarded as an innovation is not entirely new and is followed by some of the trial courts. It would save a retrial of many cases, and consequently avoid the delay necessarily incident to the granting of new trials. Nor would it do any injustice to either party. If the plaintiff is entitled to compensation, and nothing more, there seems no good reason why the amount in excess of compensation if due to an erroneous instruction should not be ordered to be remitted by this court, leaving the judgment in other respects to stand. We have authority for this in C. & O. Ry. Co. v. Judd, 106 Ky., 364. In that case the jury separated their finding of damages, allowing $13,500 as compensation, and $5,000 as smart money. The court holding that the plaintiff was not entitled to exemplary damages and that the instruction permitting the jury to assess such damages was erroneous, said:

"It seems to us that this instruction would probably lead the jury to believe that they might find punitive damages in a case of mere ordinary negligence. We are not inclined to the opinion that under the testimony in this case ordinary negligence could or should be considered gross negligence. And in as much as the jury has separated its finding as to compensatory and punitive damages * * * we are of opinion that the ends of justice will be subserved by reversing so much of the

verdict and judgment as allows any punitive damages, but allowing the verdict and judgment to the extent of $13,500 to stand. The judgment appealed from is, therefore, reversed, and the cause remanded, with directions to the court below to set aside the $5,000 verdict and judgment for punitive damages, and to render judgment only for $13,500.''

In reference to the admission of incompetent evidence, it may be said that there was some evidence permitted to go to the jury relating to the arrest of appellees for disturbing the peace in Cave City, although in an instruction the jury were properly told to disregard this evidence, as there was no evidence connecting the company with the arrest. However, upon another trial of the case, no evidence upon this question should be admitted unless it is sufficient to show that the company procured the wrongful arrest.

For the error indicated, the judgment in each case must be reversed, and it is so ordered.