## Chesapeake & Ohio Railway Company v. Pruitt.

(Decided January 27, 1914.)

Appeal from Johnson Circuit Court.

1. Carriers—Carriers of Passengers—Termination of Relation.— When the relation of carrier and passenger is once established, it continues until the passenger has alighted from the train, and has had a reasonable time to leave the premises, unless he be detained by the further necessity of relation with the servants of the carrier. But this rule will not be construed so as to include within its operation one who was drinking intoxicants and flourishing a revolver on a passenger train, and who after ar-

rival at the point of destination alighted from the train, and walked across a side track to a point probably 25 or 30 feet from the train, placed his luggage down, and then went back to the train for the purpose of recovering from the conductor the revolver which said passenger had so flourished and which the conductor had taken from him, and which weapon the conductor had informed the passenger would be turned over to the sheriff. In such case the carrier is not liable for injuries received by the former passenger, for it had at the time no connection or privity with him.

2.    Carriers—Passengers—Conductors of Passenger Trains—Powers and Duties.—In Kentucky, the conductors of passenger trains occupy a peculiar position. In addition to the duty which they owe to the carrier, they also owe a duty to the Commonwealth, imposed upon them by express statutory enactment; and that duty is one not imposed on other citizens. And in the discharge of the imposed duty no reasonable presumption will be denied in favor of the bona fides of a conductor's acts in respect thereof.

WORTHINGTON, COCHRAN & BROWNING and M. C. KIRK for appellant.

VAUGHAN & HOWES for appellee.

OPINION OF THE COURT BY JUDGE HANNAH—Reversing.

W. A. Pruitt sued the Chesapeake & Ohio Railway Company in the Johnson Circuit Court, for damages for injuries claimed to have been received by him in an assault committed upon him by the crew of one of defendant's passenger trains. From the judgment entered upon a verdict in favor of plaintiff, in the sum of seven hundred and fifty dollars, the defendant appeals.

The testimony in substance shows that the plaintiff boarded one of defendant's passenger trains at Whitehouse, in Johnson County, on the morning of February 22nd, 1909, and went to Catlettsburg in Boyd County. There, after transacting a small amount of business, he spent the greater part of the remaining time in visiting saloons, drank a supply of intoxicants, and purchased a quantity thereof to take with him on his return trip. On the afternoon of the same day, he took passage on another of defendant's passenger trains to return to Whitehouse, having with him, as he says, eight quarts of beer and a gallon of gin. On the return trip he was drinking on the train, passing his bottles around among the passengers, and displaying his revolver and flourish-

ing and pointing it around, to the annoyance of the other passengers. Finally, the conductor, Frank Blevins, took the revolver from plaintiff. Just what thereafter became of it the evidence does not disclose. The train arrived at Whitehouse after nightfall; and plaintiff alighted therefrom at that point. He went across a "passing" track to a point probably twenty-five or thirty feet from the train, placed his luggage on the ground, met his son, Jack Pruitt, and then returned to the side of the train where the conductor was, as he claims, for the purpose of requesting a return of his revolver. Immediately a fight occurred in which Conductor Blevins was shot in the back and mortally wounded, and the plaintiff, Pruitt, was shot and otherwise injured. It was for these injuries that this action was brought.

If the defendant company is liable at all, the verdict is not so flagrantly against the evidence as to require a reversal of the judgment appealed from, although the weight of the evidence is to the effect that plaintiff, acting with his son, was the aggressor. Nor is the verdict excessive in view of the character and extent of the injuries received by plaintiff.

But the vital question, is the right of the plaintiff to recover at all for injuries inflicted upon him under the circumstances here shown. This right depends altogether upon whether or not plaintiff, at the time he received the injuries of which he complains, was in law a *passenger* of the defendant carrier. If, when he received said injuries, he was still a passenger, then it was the duty of the defendant to protect him from assault by its servants; but, if he had then ceased to be a passenger, then the defendant is not responsible for injuries received by the plaintiff in an altercation between the conductor and one to whom it owed no duty and between whom and the company there was no connection or privity. Cent. R. Co. v. Peacock, 69 Md., 257; 14 Atl., 709; 9 Am. St. Rep., 425; L. & N. v. Scott, 141 Ky., 538.

When the relation of carrier and passenger is once established, it continues until the arrival of the train at the point of destination, and until the passenger has had a reasonable time to depart from the train; and after alighting from the train, the passenger does not cease to be such until he has had a reasonabe time to leave

the premises of the carrier. After the passenger has departed from the car, and has had a reasonable time and opportunity to avoid further danger from the operation of the car, or *further necessity of relation with the servants of the carrier,* and to leave the premises, he ceases to be a passenger, and stands toward the carrier as one of the general public. See 6 Cyc., 542. If the servant of a carrier, for his own purpose, assaults one of the *general public,* the carrier, owing such one no duty of protection, cannot be held liable for such assault. But so long as the passenger is being transported, or is on the premises of the carrier legitimately in connection with such transportation, the carrier's duty of protection continues.

The relation of carrier and passenger had been established between the railroad company and Pruitt at the time the latter boarded the train at Catlettsburg, and it continued to exist until the train arrived at Whitehouse, and until appellee had alighted from the train and crossed the side-track in making his departure from the premises. Had one of appellant's train-crew pursued appellee when he alighted, and unlawfully assaulted him while he was thus departing from the premises of the appellant, and before he had had a reasonable time to leave said premises, there could be no question of his right to recover of appellant therefor. Wise v. South Covington & C. Ry. Co., 34 S. W., 894, 17 R., 1359.

However, appellee concedes that he was not endeavoring to leave the premises of the carrier; but admits that after going across the side-track, and as he says he thinks, into the depot, he deposited his luggage, and returned to the side of the train from which he had theretofore alighted. So, instead of making an effort to leave the premises within a reasonable time, he doubtless consumed more time in returning to the train than it would have required for him to have continued on off the premises. But, the fact that he failed to leave the premises immediately, but returned to the train, would not of itself terminate his relation as passenger, had there been *further necessity of relation with the carrier's servants.*

So the question narrows down to the single inquiry of whether in the return of appellee to the train, there was *any further necessity of relation with the carrier's*

*servants.* Had appellee forgotten some article of personal property, and returned to the train to recover it, such return would have been legitimately in connection with the transportation; or, had he returned to ask information relative to the arrival or departure of connecting trains or gain information of like nature, doubtless the relation could not be said to have terminated.

To determine the quality of the act of appellee in returning to the side of the train, as affecting the question of whether the relation of carrier and passenger had terminated, it is necessary to detail certain facts concerning the occurrences on the train during its movement from Catlettsburg to Whitehouse. It has already been noticed that appellee was drinking intoxicants on the train, and giving it to other passengers; that he had taken from his person where he had it concealed, a revolver, and had flourished and pointed it around on the train; that Conductor Blevins had taken the revolver away from appellee, for the protection of the passengers, which it was his duty to do. Appellee himself swears that some of the passengers went back and told the conductor that he, Pruitt, had the weapon out. One passenger testified that he left the coach before the train arrived at Whitehouse; that "he (Pruitt) was handling the pistol, and seemed to be intoxicated, and I was uneasy; I didn't feel safe with him." The evidence also shows that appellee had threatened the conductor before the revolver was taken from him; one witness states that appellee said that he would "play ball" with Blevins if he had appellee arrested when they arrived at Louisa, on the way to Whitehouse; another said that appellee said he would "get the d— son of a b—."

It is the contention of the appellant that appellee, as soon as he got with his son, Jack Pruitt, came back to the train for the purpose of assaulting the conductor; and five witnesses, three of them disinterested passengers, swear that appellee came back with one of his quart bottles in his hand, and struck some one of the train crew before anything had been said or done to him, while the appellee only introduced three witnesses in chief, and only one new one in rebuttal, and one of these swears that there was one shot fired before the conductor did anything. Appellee says "I walked back there for my gun." He had asked Conductor Blevins for the return of his revolver while on the train; and

Blevins had informed him that he would not give it to him, but was going to turn it over to the sheriff. Upon the arrival of the train at Whitehouse, when appellee went across the side-track and over to the depot, he met near it his son, Jack Pruitt; and the record shows without contradiction that this son shot Conductor Blevins in the back and killed him. The decided weight of the evidence is to the effect that this was the first shot fired; and that it was fired before any blows were struck, although on this point the evidence is conflicting.

Appellee's purpose in returing to the side of the train then, was either to recover the revolver as he contends, or to have an altercation with the conductor as contended by appellant; but, assuming that he did return for the revolver, this, under the circumstances, was not a *necessary* continuation of his relations with the carrier's servants, within the meaning of the rule that the relation of passenger continues after he has alighted from the train, and until he has had a reasonable time to leave the carrier's premises, or longer, if he be detained by the *further necessity of relation with the carrier's* servants. It may be true that the conductor still had the revolver which he had taken from appellee; but its recovery under these circumstances, was not a necessary ground for further relations with the carrier's servants, such as would continue in his behalf the protecting operation of the rule governing the termination of the relation of passenger and carrier. He had already been informed by the conductor that the weapon would not be delivered to him, but would be turned over to the sheriff; and the conductor had a right to make such disposition of the weapon as his judgment indicated would be safe and proper.

In Kentucky, the conductor of a passenger train occupies a peculiar position. Not content with the protection to passengers afforded by the carrier's duty to protect and its liability for failure to protect its passengers, the Legislature has by express enactment undertaken to place additional safeguards around passengers upon such trains; and by special statutory provision (Ky. Statutes, Sec. 806; and Chap. 18, Acts 1910) it has been made the duty of conductors to prevent boisterous and riotous conduct, and the drinking of intoxicants upon such trains; and such conductors, in addition to

the duty which they owe to their employer, also owe a duty to the Commonwealth, which duty is one imposed upon them by said statutory provisions, and is not imposed upon other citizens. This is for the protection of the traveling public; and is a wise provision of law. And in the discharge of this imposed duty, no reasonable presumption will be denied in favor of the *bona fides* of a conductor's acts in respect thereof; nor will the rule as to the continuation of the relation of passenger and carrier be construed so as to include within its operation, one, who under circumstances such as are shown to have existed in this case, goes back to the train to recover a weapon, in the carrying of which he violated the law, in the flourishing of which on the train, he again violated the law; and which weapon special statutory enactment made it the duty of the conductor to deprive such person of, if necessary, for the protection of his fellow passengers. For the time being, appellee had by his conduct forfeited his right of possession of said weapon, and it was the duty of the conductor to keep it from him, at least until in his sound judgment it was safe to deliver it back to him. In the light of the testimony, it would have been more dangerous to the passengers to have given the revolver to appellee just as he was leaving than it would to have allowed him to keep it from the beginning, as there was ground for believing that, he being then more deeply incensed at the conductor, the probability was greater that he might shoot among the passengers.

The evidence is conclusive that his return to the train was for no lawful purpose; and in law and in fact the relation of carrier and passenger had terminated before appellee received the injuries complained of; and appellant cannot therefore be required to respond for same in damages. See L. & N. v. Scott, 141 Ky., 538; 133 S. W. 809; 34 L. R. A. (N. S.), 206.

The court, therefore, erred in refusing to direct the jury to find a verdict for the defendant; and the judgment is reversed, with directions for proceedings consistent with this opinion.

Whole court sitting.