## Louisville, Henderson & St. Louis Railway Co. v. Gregory's Admr.

(Decided January 26, 1911.)

### Appeal from Breckinridge Circuit Court.

1.  Carriers—Duty of, to Intoxicated Passenger.—The mere fact that a passenger is drinking or under the influence of liquor is not enough to put upon trainmen the extra duty of giving to him more care than to other passengers. This measure of duty is only demanded when the condition of the passenger is such that he is helpless or incapable of taking care of himself. If a passenger on account of intoxication that does not produce helplessness or incapacity is rendered less capable than he would otherwise be of protecting himself from accident or injury, or his condition induces him to become more indifferent

to his safety, he must yet take the consequences of his own recklessness, and the company will not be charged with the duty of taking especial care of him.

2. Intoxicated Passenger—When Duty to Protect Arises.—Trainmen are not obliged to anticipate that a passenger who is under the influence of liquor will unnecessarily expose himself to danger; nor are they under a duty to exercise more than ordinary care to discover whether passengers are drunk or sober. It is only when their attention is directed either by observation or information to the helpless condition of a passenger, or when by the exercise of ordinary care his condition could be discovered, that they are under a duty to exercise reasonable care to protect him.

3. Vestibule doors on cars.—It is not negligence under all circumstances for a carrier to fail to equip its cars with vestibule doors or leave these doors open.

4. Equipment of Cars with Air Brakes.—The fact that the air brakes on a passenger car are defective will not warrant a recovery on the part of an injured passenger unless it is shown that the condition of the brakes was the proximate cause of his injury.

5. Application of Principles to Facts.—A partially intoxicated passenger, in obedience to notice that his station had been reached, started to leave the train, when it was suddenly stopped on a trestle before reaching the station. When he stepped out on the platform he was informed by the conductor that the train was standing on a trestle, and directed to go back in the car, but in place of so doing, remained on the platform and in some manner fell off, receiving injuries from which he died. Held: that under the circumstances the company was not liable.

R. A. MILLER and CLAUDE MERCER, for appellant.

JOHN P. HASWELL, JR., S. M. PAYTON and HAZELRIGG & HAZELRIGG, for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

This action was brought by the appellee to recover damages for the death of Emmett Gregory alleged to have been caused by the negligence of the appellant company while carrying him as a passenger over its road from Louisville to Cloverport.

There is a long trestle that runs nearly to the depot at Cloverport, and the usual announcement to passengers for Cloverport to leave the train is made just before the train gets on this trestle. On the night in question "Cloverport" was called out by the trainmen at the usual place, and as the passengers for Cloverport, including Gregory, were getting ready to leave the train,

it suddenly stopped on the trestle. This unexpected stop was caused by the breaking of the air hose, thereby automatically applying the brakes to the wheels of the train. While the train was standing on the trestle, Gregory, who had gone out on the platform of the car, fell from it to the ground, receiving injuries from which he shortly died. The negligence charged consists, first, in permitting Gregory, who it is alleged was in a helpless state of intoxication, to go out on the platform when the train stopped on the trestle and remain there unprotected; second, in permitting the platform to be and remain covered with ice, and third, in permitting the air hose to become so defective as to break.

The answer placed in issue all the material averments of the petition, and pleaded contributory negligence.

Upon a trial before a jury a verdict was returned in favor of the appellee for six thousand dollars. A reversal of the judgment on this verdict is asked for error in giving and refusing instructions; and the appellee also complains of the ruling of the trial court in refusing to submit to the jury in appropriate instructions the alleged negligence of the company in permitting ice to accumulate on the platform of its cars and in failing to have and keep its air hose in proper condition.

As a result of the rulings of the court the only issue of negligence submitted was in respect to the intoxicated condition of Gregory and the duty the trainmen owed to him. We have reached the conclusion, for reasons that will be hereafter stated, that the evidence failed to show that Gregory's condition was such as to impose upon the train crew any greater care in protecting him than they exercised, and so, if this was the only issue in the case which should have been submitted to the jury, the appellant company was entitled to the peremptory instruction requested. But, notwithstanding this, if the company was negligent in permitting the platform of its cars to become covered with ice or in permitting its air hose to become in such a defective condition as to break, thereby suddenly stopping the train, and either of these causes contributed proximately to the death of Gregory, then the case should have been submitted to the jury upon these issues, although appellee may have failed to make out a case upon the question of neglect on the part of the company in taking proper care of Gregory. Having this view of the matter, we will first consider the correctness of the rulings of the trial judge in refusing to sub-

mit instructions upon the issues mentioned before taking up the principal question in the case.

Gregory was riding in what is known as a chair car. There was attached to the rear end of this chair car a Pullman sleeper, and the car in front of it was an ordinary passenger car. The rear platform of the chair car was protected by vestibule doors, as this end was coupled to a vestibuled car; but the car in front was not equipped with vestibule doors, and so the vestibule doors on the front end of the chair car in which Gregory was riding were not closed and could not be closed, except partially. The result of this was that the front platform of this car was only protected from the weather in the usual way that platforms of cars without vestibule doors are protected, and it was through the door on this end of the car that passengers for way stations entered and made their exit. After the train left Louisville, from which place it started on its journey, it commenced to rain and freeze, and consequently the rain that fell on the front platform of the car formed a slippery surface on one side of the platform and on the car steps on that side, although it does not appear that the platform in front of the door was covered with ice or in a slippery condition. But the failure to have this end of the car protected by vestibule doors was not under the circumstances negligence, although there might be conditions in which it would be. (Elliott on Railroads, 2 Ed., Vol. 4, section 1589a.) A railroad company may run passenger cars without vestibule attachments, and there are no facts in this record from which it can be inferred that it was negligent in failing to have the front end of this car protected by vestibule doors or that the failure to so protect it contributed proximately to Gregory's death. It is probable that if this end of the car had been protected by vestibule doors that no rain or ice would have gotten on the platform. But the railroad company did not owe Gregory the duty of having vestibule doors. His place was in the car and not on the platform, and if he had not remained on the platform no injury would have befallen him. It may also be conceded that under certain conditions and circumstances it would be negligence upon the part of the company to permit the platform or steps of its passenger cars to remain covered with ice, or in a slippery condition, and we can easily imagine a state of case in which the company would be liable for injury received by a passenger on account of the slippery condition of the platform or steps of its passenger

cars. But the facts of this case do not justify us in reaching the conclusion that the company was negligent as to Gregory in this respect. How he came to fall is not known. It is possible that the slippery condition of a part of the platform contributed to bring about his fall; but, whether it did or not, is mere speculation. There is nothing to show that he would not have fallen if the platform had been entirely free from ice.

In respect to the breaking of the air hose, section 778 of the Kentucky Statutes provides that:

"No regular or other passenger train shall be run without an air-brake, or some equally effective appliance for controlling the speed of trains, which may be applied by the engineer to each car composing the train, and which shall, at all times, be kept in good condition and ready for use at the discretion of the engineer. * * *"

But there is no evidence that the breaking of the air hose was due to negligence on the part of the company. The evidence upon this subject is that the air hose was properly inspected and in good condition when the train left Louisville, and that no defects in it were discovered until it suddenly parted as the train was approaching Cloverport. It is true that if the air hose had not parted the train would not have stopped on the trestle; and also true that if it had not stopped on the trestle, Gregory would not have fallen from the train through the trestle. But, manifestly, the admission of these two propositions do not in any manner establish that the company was guilty of negligence as to Gregory on account of the condition of the air hose. Trains often stop at unexpected and dangerous places, but this fact in itself is not sufficient to fix liability upon the company for injury to a passenger who falls or steps from the train at a place at which it unexpectedly and suddenly stops, in the absence of facts or circumstances showing negligence in other respects. And there is no evidence that the breaking of the air hose proximately brought about or contributed to the death of Gregory. Indeed, the evidence that we will presently recite makes it perfectly plain that if the question of Gregory's intoxicated condition was left out of the case, there would not be a single fact or circumstance from which it could be inferred that the company was guilty of any act of negligence towards Gregory. Nor would there be the slightest doubt that his death was brought about solely by his own negligence. In making this statement we do not of course mean to be understood as implying that there is any

evidence tending to show that the company was guilty of negligence in failing to exercise the required degree of care in protecting Gregory, because we are satisfied that his condition was not such as to impose upon the company the duty of rendering him more care than it did other passengers similarly situated. And we are further of the opinion that the court should have, as requested by the company, peremptorily instructed the jury to find a verdict for it. This request was based on the proposition that the condition of Gregory was not such as to charge the company with notice that he was in a helpless condition or unable to take care of himself, and consequently the trainmen were not negligent in failing to exercise reasonable care to protect him. The evidence upon this subject is as follows:

Miss Davis, a passenger, testified as follows:

"Q. Tell the jury in your own way what you know about it and what you saw of it?"

"A. We were coming from Louisville, father and myself, on our way to Owensboro, and the train stopped on the trestle, and when it stopped Mr. Gregory started to get off the train and was on the outside of the door, and the conductor put his hand on his shoulder and told him not to step off, that we were not to Cloverport, that we had stopped on the trestle. Mr. Gregory turned back and looked in the door, and in a few minutes I heard him fall. * * *"

"Q. Do you know whether Mr. Gregory was intoxicated that night?"

"A. No, sir, I do not."

"Q. You didn't see him do anything or hear him say anything to cause you to think he was?"

"A. No, sir."

"Q. Did the brakeman lead him to the door?"

"A. Not that I saw."

"Q. If he did you didn't notice it?"

"A. No, sir, he was walking by himself when he passed the seat where I was sitting." * * *

"Q. You say when Mr. Gregory passed by you he was walking alone?"

"A. Yes, sir."

"Q. Do you know which one of the train men it was that told him they was on the trestle and that wasn't the station?"

"A. No, sir, I do not."

"Q. You heard of it?"

"A. Yes, sir."

"Q. Did you hear what Mr. Gregory said in reply to that?"

"A. No, sir."

"Q. Then the trainman went out on the platform?"

"A. Yes, sir."

"Q. Did Mr. Gregory go out the door?"

"A. Yes, sir."    *    *    *

"Q. After Mr. Gregory went out the door, did you see him come to the door?"

"A. Come back to the door?"

"Q. Yes?"

"A. Yes, sir."

"Q. Did he open it?"

"A. Yes, sir."

"Q. How long had the train been stopped then, Miss Davis, about how many minutes?"

"A. Well, a short time, probably two or three minutes."

"Q. Did he close the door when he opened it, did he close it again?"

"A. Yes, sir."

"Q. Do you know whether the conductor or brakeman were out on the platform at that time, or whether they had gone to see what was the matter with the train?"

"A. I do not know."

W. E. Davis, the father of Miss Annie Davis, testified:

"Q. Did you see Mr. Gregory that night on the train?"

"A. Yes, sir, I seen a man that was said to be Mr. Gregory, I didn't know the man."

"Q. Where was he on that train the first time you saw him?"

"A. Well, I seen him before we left Louisville, before they left the depot, that is, before the train pulled out.'"

"Q. What was his condition then?"

"A. Well, when I seen him, I was back in the smoker, and he came back, and there was only two of us in there when he came in. And he came in and he and this other man got to passing the bottle."

"Q. Drinking?"

"A. Yes, sir."

"Q. Well, what was his condition at that time, was he already intoxicated?"

"A. Well, he was under the influence to some extent."

"Q. What size bottle were they passing?"

"A. I think it was a pint bottle."

"Q. Well, then, when did you next see him?"

"A. I never seen him any more until the train stopped down near Cloverport."

"Q. What do you know further about him?"

"A. Well, when they stopped there he came through the train, and when he got to the door, there was three of them as if though to get off, and when they got to the door of the front end of the coach, they stopped there, and I think the conductor or brakeman or some of them said to them 'We are not at the station yet, wait a while, go back and sit down,' and they stopped, and the lady and one man went back and sat down, and this man Gregory he didn't come back in the coach, he stood at the door." * * *

"Q. State how they went to the door, how Mr. Gregory went?"

"A. All I seen of those that were there went just like any other people would go to get off the train."

"Q. Which went first, Mr. Gregory or the young lady, Miss Willis, which was in the lead?"

"A. Mr. Gregory was in the lead."

"Q. Did you notice whether when that train stopped with a thug, that this lady, Miss Willis, lunged up against the side of the door?"

"A. I don't think I could state positively about that, because it seems to me that the train stopped for a little bit before those passengers started, but I am not positive about that though."

M. L. Howard, the train conductor, introduced by the appellee, testified:

"Q. Did you know Mr. Gregory?"

"A. Yes, sir."

"Q. You are acquainted with him?"

"A. Yes, sir."

"Q. He was a passenger on your train, was he?"

"A. He was."

"Q. Where did he get on?"

"A. Louisville."

"Q. What was his condition when he got on there as to sobriety or intoxication?"

"A. Well, he wasn't a man that I would consider drunk."

"Q. Well, was he intoxicated?"

"A. Knowing him as I did if I hadn't known him possibly I wouldn't have considered him drinking at

all, but I knew him, and in that way I knew that he was drinking, or thought he was" * * *

"Q. Where did you see Gregory first that evening?"

"A. On the train, do you mean?"

"Q. That evening, on the train or off the train, where did you see him?"

"A. Do you mean after leaving Louisville?"

"Q. No, before?"

"A. In the depot."

"Q. What state of intoxication was he in then?"

"A. Well, he walked through the depot there. I wouldn't consider him a drunken man. As I said, knowing him as I did, I noticed that he was drinking."

"Q. What degree of intoxication was he in?"

"A. Well, he could get along with what he had."

"Q. He could walk, you mean?"

"A. Yes."

"Q. How long was it from the time you saw him in the depot until you saw him getting on the train?"

"A. I didn't see him get on the train."

"Q. How long was it before you accepted his ticket as a passenger to Cloverport?"

"A. Possibly an hour, I don't remember how long, it might be an hour and a half."

"Q. At that time, was he drinking?"

"A. I considered him so."

"Q. Well, did you see him at intervals from that time to Cloverport, when you passed through the train?"

"A. Possibly three or four times, I don't remember just how many."

"Q. Did you see him drinking on the road?"

"A. I did not."

"Q. Did you talk to him any or hear him talk as you went down?"

"A. I never talked to him any on the train." * * *

"Q. And you say that Mr. Gregory was intoxicated the first time you saw him, and he was intoxicated the first time you received him as a passenger?"

"A. I didn't say he was intoxicated. I didn't say that he was a man I would call intoxicated. I said, knowing him as I did I thought he was drinking." * * *

"Q. When you saw him in the station before he got on the train, tell the jury how long that was before the train started, about how long?"

"A. The first time I seen him?"

"Q. Yes?"

"A. An hour or an hour and a half, or something like that, I don't remember just how long it was."

"Q. Did he ask you any question then?"

"A. Not the first time I seen him, but something like thirty or forty minutes before leaving time he did."

"Q. What did he ask you?"

"A. Asked me if he could get on the train. I told him I didn't know whether he could or not, if he could get around the gateman possibly he could."

"Q. That was about thirty minutes before train time?"

"A. Something like thirty or forty minutes."

"Q. Well, was he able to take care of himself at that time?"

"A. There wasn't any one with him that I know of."

"Q. I didn't ask you if there was any one with him. Was he able to walk around and take care of himself?"

"A. Yes, sir."

"Q. You didn't see him get on the train?"

"A. I did not, that was the last time I seen him until I saw him on the train, after he asked me about getting on the train."

"Q. You didn't regard him as being drunk when you saw him either time?"

"A. He wasn't what I call a drunk man, no, sir."

\* \* \*

"Q. Did you say anything to those passengers at all, make any announcement to them?"

"A. When the train stopped there, I did."

"Q. What did you say?"

"A. I announced in a very loud voice not to get off, that we were stopped on standing on the trestle."

"Q. That was when you went out on the platform?"

"A. That was when the train first stopped."

"Q. Did some passengers come to the door or near there?"

"A. Passengers were coming up to the door."

"Q. You don't know who all were in that crowd?"

"A. I couldn't name any one with the exception of young Berry."

"Q. You didn't notice whether Mr. Gregory was one of the persons that came up there or not."

"A. I did not."

"Q. The train was standing, as I understand you, perfectly still?"

"A. When I made this announcement?"

"Q. Yes?"

"A. Yes, sir."

Miss Willis testified as follows:

"Q. What coach were you sitting in?"

"A. In the chair car."

"Q. Was that the same coach in which Mr. Gregory was at the time the train stopped?"

"A. Yes, sir, at the time the train stopped he was at the door of that coach, on the platform of the coach."

"Q. At the time the train stopped he was on the platform of the coach?"

"A. Yes, sir."

"Q. Where were you at this time?"

"A. Standing in the door."

"Q. How many passengers were there that night for Cloverport, to get off at Cloverport?"

"A. There was three; myself, Mr. Gregory and Mr. Berry."

"Q. You had gotten up from your seat to get off, and walked down the aisle towards the front door before the train stopped?"

"A. Yes, sir."

"Q. Now, why did you do that?"

"A. They called out Cloverport."

"Q. Who called it out?"

"A. I don't remember. It was called out, but I don't remember who it was."

"Q. Who reached the platform first, you or Mr. Gregory?"

"A. He did."

"Q. Was any one with Mr. Gregory?"

"A. Yes, sir, the flagman was with him."

"Q. State whether or not he had hold of Mr. Gregory as he walked up the aisle?"

"A. Yes, sir, he did."

"Q. How did he hold him?"

"A. Why, I don't remember exactly, I just know that he had hold of his arm coming through the car, I don't remember exactly."

"Q. Now, did they go past you before you had arisen from your seat?"

"A. No, sir, I was almost to the door."

"Q. Why did you let them pass you, why did you stand aside?"

"A. Well, because I did, just wanted them to pass me."

"Q. Can you tell what the condition of Mr. Gregory was at this time, when you stood aside and let them pass, with reference to being intoxicated or not?"

"A. Well, he seemed to be. I thought at the time that he was and that was one reason I stood aside."

"Q. How did the flagman, Miller, have hold of his body or his arm?"

"A. Had hold of his arm."

"Q. Did or not the flagman go through the door on to the platform of the car?"

"A. The flagman was with him and went with him out the door, on to the platform."

"Q. Then where did the flagman go, if he went anywhere?"

"A. I don't know, I wasn't paying any attention."

"Q. I will ask you whether or not you were able to stand when the train stopped without catching hold of anything?"

"A. I am never that way. I always catch hold of something when the train stops."

"Q. Did you upon this occasion?"

"A. I think I did."

"Q. What was it you caught hold of to steady yourself when the train stopped?"

"A. I was right in the door, and I stood up against the door, the doorway." * * *

"Q. After the train stopped, what did you do?"

"A. Well, after the train stopped, I went back and sat down in the car. I was standing in the door at the time the train stopped, and Mr. Howard said that we had stopped on the trestle, so I went back, and he said we had stopped on the trestle, and he turned around to Mr. Gregory then and told him we had stopped on the trestle."

"Q. Where was Gregory when he told him that?"

"A. He was standing on the platform."

"Q. Do you know what became of Mr. Gregory?"

"A. No, sir, I do not."

"Q. Did you see him any more after you turned around to go back?"

"A. After I turned around and went back and sat down, I saw him again after that." * * *

"Q. Mr. Sam Berry was the other passenger who was to get off at Cloverport that night, I believe?"

"A. Yes, sir."

"Q. And he closed the door?"

"A. Yes, sir."

"Q. And left Gregory on the outside of the door on the platform and you and he on the inside of the coach, is that correct?"

"A. Yes, sir, we were inside, and I suppose Mr. Gregory was out there; I don't know where he went."

"Q. Did he come back in the car?"

"A. He opened the door and looked in the car."

"Q. When was that?"

"A. Well, I don't know, just a few seconds before the train started, into the station, he opened the door and looked into the car."

"Q. Did he step inside?"

"A. No, he just opened the door and stood in the door and looked in the car."

"Q. What do you know as to his movements after that?"

"A. I don't know, only he closed the door; I don't know what he did."

"Q. You saw no more after that?"

"A. No, sir." * * *

"Q. Well, the first thing that the conductor said, if I understood your testimony, was, that this is the trestle, and we are not down at the station yet, was that about the substance of it?"

"A. He said this is the trestle not to step off."

"Q. Now, he or the brakeman, one or the other turned and repeated the same thing to Mr. Gregory?"

"A. Mr. Howard said the same thing."

"Q. Did Mr. Gregory make any reply to that?"

"A. No, he didn't that I remember, but he looked as if he understood what the conductor said, but I don't remember of him saying anything."

"Q. If I understood you, the brakeman simply had his hand on Mr. Gregory's arm as he passed you in the aisle?"

"A. Yes, sir."

"Q. He was not shoving him or carrying him or anything like that?"

"A. I don't remember anything about them. I remember he had his hand on his arm and seemed to be leading him."

The foregoing is all the testimony introduced for the appellee upon the subject of Gregory's condition. Sam Berry, introduced for the appellant, testified as follows:

"Q. Did you see Mr. Gregory on the train when you first got on at Irvington?"

"A. No, sir."

"Q. Did you see him at any time?"

"A. I seen him standing on the platform of the car."

"Q. Was it before or after the train stopped?"

"A. After the train had stopped."

"Q. What was he doing on the platform?"

"A. Just standing there looking through the door, the door was shut."

"Q. Do you know whether Mr. Gregory went out of the coach in which you were riding before you went out or afterwards?"

"A. I never saw Mr. Gregory inside the car, I couldn't say."

"Q. Did you go out on the platform yourself, Mr. Berry?"

"A. Yes, sir."

"Q. Did you discover that you were on the trestle and not at the station?"

"A. When Mr. Howard told me, yes, sir, the conductor."

"Q. What did the conductor say?"

"A. He said lookout, don't get off, we are on the trestle."

"Q. Did he say that in a loud voice or in a low voice?"

"A. Yes, sir, he said it in a loud voice."

"Q. So that everybody could hear?"

"A. Yes, sir."

"Q. What did you do then?"

"A. I told him, I said, I see we are."

"Q. What did you do?"

"A. I stood out there a little bit and went back in and sat down."

"Q. Did you know Mr. Gregory?"

"A. No, sir."

"Q. Well, you did see him afterwards on the platform there looking in the door, what was his condition so far as you could see?"

"A. I couldn't tell anything of his condition, sir."

"Q. Couldn't tell anything about it?"

"A. He was just like any other man."

"Q. Just standing around there like anybody else would be?"

"A. Yes, sir."

"Q. As far as you could see, was he able to take care of himself?"

"A. He seemed as able to take care of himself as I was to take care of myself."

Harry Thompson, the flagman, testified:

"Q. Where were you sitting when the train stopped?"

"A. I was sitting about the third seat from the rear end, just outside of the compartment from the smoker into the ladies car, about the third seat from the door."

"Q. You were in the main body of the chair car?"

"A. Yes, sir."

"Q. And about three seats from the rear portion of that part of the car?"

"A. Yes, sir."

"Q. Did you see Mr. Gregory coming through the car on his way to the front end?"

"A. Yes, sir."

"Q. Where was he at the time the train came to this sudden stop?"

"A. Well, he was just opposite me, just about one seat ahead of where I was sitting at."

"Q. The train stopped suddenly did it?"

"A. Yes, sir."

"Q. What kind of stop did the train make?"

"A. It made a sudden stop, nothing unusual, but a sudden stop."

"Q. What effect does that have on a man standing in the aisle, or walking along, whether he is drunk or sober?"

"A. Well, a stop like that will make anybody stagger, when it first stops why he will go ahead for two or three steps, and when the train does stop he will come backwards two or three steps."

"Q. Sometimes it throws people down?"

"A. Yes, sir, sometimes it does."

"Q. What effect did it have on Mr. Gregory when it stopped that way, you say he was near you, and perhaps just a little in advance of you?"

"A. Well, just about the time that he got even with me, I got up out of my seat. Of course, when the train stopped I fell over against the seat, the seat just ahead of me, and when he started staggering backwards, I steadied him up with my arm to keep him from falling backwards."

"Q. Did you walk with him from that point to the front of the car?"

"A. I did."

"Q. Could he walk all right?"

"A. Yes, sir, as good as I could down there."

"Q. Did he require òr need support from you after that motion of the train was over?"

"A. No, sir, he did not."

"Q. Was there anything in his manner or condition as far as you could observe it, to indicate that he was drunk?"

"A. No, sir."

"Q. State to the jury whether you were under the impression also that the train had stopped for Cloverport as you walked forward?"

"A. Yes, sir, I was at that time."

"Q. When did you learn otherwise?"

"A. When I got down to the door."

"Q. How did you learn it?"

"A. From what I could see."

"Q. You saw you were on the trestle?"

"A. Yes, sir."

"Q. When you saw you were on the trestle, what did you say or do, or both?"

"A. Oh, well, as quick as I saw we were on the trestle, why I pushed Mr. Gregory back on the inside, and told him, I said, you stand here until I come back and tell you we are at Cloverport, we are here on the trestle, and so he said all right, and I goes on back to the rear end to see what the trouble was."

"Q. You left him standing then inside the door of the coach?"

"A. Yes, sir, I did."

"Q. Well, you say when the train stopped that Gregory got up about one seat ahead of you?"

"A. Yes, sir."

"Q. And the jar when you stopped threw him out of balance and you grabbed him?"

"A. Yes, sir."

"Q. Did you hold on to him until you got to the front?"

"A. Yes, sir, after he started backwards I reached out and caught his arm, like I would any one, and started on down to the front of the car with him."

"Q. Went all the way?"

"A. Yes, sir, all the way."

"Q. Did anybody else go out of the coach on to the platform?"

"A. Yes, sir."

"Q. Who?"

"A. Mr. Gregory and myself."

"Q. Who else?"

"A. Mr. Miller, the flagman."

"Q. Who else?"

"A. Also the conductor, Mr. Howard."

The foregoing is the only evidence that throws any light upon the condition of Gregory, and in our opinion his condition was not such as to put upon the trainmen the duty of exercising any more care to protect him than they would be obliged to exercise to protect any other passenger. A fair summary of it is that Gregory was drinking, and to some extent under the influence of liquor when the train left Louisville as well as when it stopped on the trestle, but it does not appear that he was at any time in a helpless condition or unable to stand alone or to walk by himself or to take care of himself. When "Cloverport" was called out by the trainmen, he got up for the purpose of getting out as did the other passengers for Cloverport, and while he was on his way to the door the breaking of the air hose caused the train to suddenly stop. Gregory, who was then in the aisle, was thrown off his balance and the flagman who was immediately behind him, caught him by the arm and walked with him in this way to the door. When the door was reached, and about the time Gregory stepped out on the platform both the conductor and the brakeman warned passengers not to get off, telling them that the train had stopped on the trestle, and when this direction was given they went to look after the cause of the sudden stopping of the train, leaving Gregory standing on the platform in front of the door. Miss Willis and Berry then went in the car and closed the door, leaving Gregory standing alone on the platform. A few minutes after this, Gregory opened the door, and looked in the car, then closed the door, and was not seen any more until after he fell from the train. No witness testifies that the platform directly in front of the door where Gregory was standing had any ice on it or was slippery, nor is there any evidence from which it can be fairly inferred that when he was left by the conductor and brakeman on the platform his condition was such as to put a person of ordinary prudence upon notice that he was unable to take care of himself. In fact, his conduct in opening the door and looking in, and then closing it, shows that he knew what he was doing and was able to take care of himself.

There was nothing in the conduct, manner or appearance of Gregory when he got on the train at Louisville that would have justified the company in refusing to accept him as a passenger nor did he do or say anything

on the trip that would indicate that he was unable to care
for himself. He was at all times orderly and well be-
haved. There is no suggestion that he did not hear the
warning of the conductor, nor is there any circumstance
from which it can be inferred that he did not fully under-
stand and appreciate what the conductor said, as well
as the dangerous place at which the train stopped. If
when he started to leave the train and got to the door
he had been so intoxicated as to lead a person of ordinary
prudence to believe. that he could not get back in the car,
the trainmen should have put him back; but that he could
have gotten back in the car if he desired is made plain
by the uncontradicted evidence that after the trainmen
and others left the platform and door, he opened the
door and looked in and then closed it again. Under these
circumstances the trainmen had the right to assume
when they gave the warning and left that Gregory would
do as the others did—go back in the car. It is the duty
of the train employes to look after the safety and com-
fort of all the passengers, and they are not required to
extend to one more protection or care than another, ex-
cept under special circumstances. And the mere fact
that a passenger is drinking or under the influence of
liquor is not enough to put upon trainmen the extra duty
of giving to him more care than to other passengers.
This measure of duty is only demanded when the con-
dition of the passenger is such that he is helpless or in-
capable of taking care of himself. If a passenger on ac-
count of intoxication that does not produce helplessness
or incapacity is rendered less capable of protecting him-
self from accident or injury than he otherwise would be
or his condition induces him to become more indifferent
to his safety, he must take the consequences of his own
recklessness, and the company will not be charged with
the duty of taking especial care of him. His right to re-
cover is no greater than would be that of a sober per-
son of ordinary prudence. A man may be under the in-
fluence of liquor and yet be as competent to protect him-
self from danger as a thoroughly sober man would be.
And it often happens that sober men expose themselves
to dangers that a partially intoxicated man would avoid.
And so there is good sense and reason in the rule that the
sober man and the partially intoxicated man are entitled
to the same measure of care—one not more than the
other. But when a passenger is so much under the in-
fluence of liquor as to be helpless or irresponsible or in-

capable of protecting himself from accident, and his condition is or could be known by the train men in the exercise of reasonable care the plainest dictates of humanity demand that he should not be permitted to remain or place himself in unnecessary peril if the persons in charge of the train by the exercise of reasonable care can prevent it. But trainmen are not obliged to anticipate that a passenger who is under the influence of liquor will unnecessarily expose himself to danger, nor are they under any duty to exercise more than ordinary care to discover whether passengers are drunk or sober. It is only when their attention is directed either by personal observation or information to the helpless, irresponsible or incapable condition of a passenger or when by the exercise of ordinary care his condition could be discovered that they are under a duty to exercise reasonable care to protect him. L. & N. R. Co. v. Logan, 88 Ky. 232; L. & N. R. Co. v. Deason, 29 Ky. Law Rep., 1259; Thixton v. Illinois Central R. Co., 29 Ky. Law Rep., 910; Cincinnati, Indianapolis, St. L. & C. R. Co. v. Cooper, 120 Indiana, 469; 6 L. R. A., 241; Fisher v. West Virginia & Pittsburg R. Co., 39 W. Va., 366, 23 L. R. A., 758; Fox v. Michigan Central R. Co., 138 Mich., 433; 68 L. R. A., 336; 5 A. & E. Annotated Cases, 72; Black v. N. Y., N. H. & H. R. Co., 193 Mass., 448; 9 A. & E. Annotated Cases, 485; Hutchinson on Carriers, section 994, Elliott on Railroads, 2d Ed., Vol. 3, Sec. 1172.

When the standard of care and measure of duty we have announced is applied to the condition of Gregory and the conduct of the trainmen, it is manifest that the liability of the company is to be tested by the same rules it would be if Gregory had been perfectly sober.

Looking at the matter from this standpoint, it is clear that the company was not guilty of any negligence in the carriage of Gregory and that his death was due solely to his own carelessness or negligence in remaining on the platform after he had been requested to go back in the car and warned that the train was standing on the trestle. Therefore, upon the evidence in the record before us, the court should have directed the jury to return a verdict for the railroad company.

Wherefore, the judgment is reversed, with directions for a new trial in conformity with this opinion.

Whole court sitting.

Judge Nunn dissenting.