# Nashville, Chattanooga & St. Louis Railway Company v. Lowery's Admr.

(Decided May 29, 1912.)

## Appeal from Calloway Circuit Court.

1. Railroads—Injury to Licensee by Passenger—Recovery Under Section 806 Kentucky Statutes.—Section 806, Kentucky Statutes, was enacted for the protection of passengers, and persons on railroad trains, and a licensee walking along a railroad track cannot recover for an injury inflicted by a passenger on a railroad train solely on the ground that the passenger was guilty of a violation of that section, and the company failed to eject him, or to give notice of such violation to some peace officer at the first stopping place.

2. Railroads—Liability for Injury, Inflicted by Passenger, to One Walking Along the Track.—A railroad will not be held liable for the malicious prank of one of its passengers in shooting and killing a person walking along its tracks in a path habitually used by the public in large numbers, unless his previous conduct was such as to bring to their knowledge the intended use of the pistol; and, with such knowledge, they failed to restrain him or to eject him from the train.

COLEMAN & WELLS, and WHEELER & HUGHES for appellant.

E. P. PHILLIPS, Z. A. STEWART for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

J. E. Lowery was shot and killed by Homer Bridges, a passenger on one of the trains of the Nashville, Chattanooga & St. Louis Railway Co. His administrator brought this action to recover damages for his death. A trial resulted in a verdict and judgment in favor of the plaintiff for $2,000. The railroad company appeals.

Lowery's death occurred under the following circumstances: On December 25, 1909, appellant's northbound passenger train, No. 61, was proceeding from Memphis to Paducah. The train reached Paris, Tennessee, shortly after 11 o'clock, a. m. At that point Homer Bridges, and several other negroes, boarded the train. When the train reached a point a few feet beyond the incorporated limits of Hazel, a town of about 800 inhabitants, located in Kentucky, near the Tennessee line; Lowery was walking along a pathway on the east side of the track, and was proceeding in the same direction

as the train. Bridges, who was seated on the east side of the train, saw Lowery walking beside the track, and made to those seated near him the following remark: "I see old Pap down the road; watch me make him jump up when I get to him." Thereupon he laid his hat on the seat, took his pistol out of his pocket, and putting his arm out of the window, fired the pistol, striking Lowery in the back, and inflicting a mortal wound, from which he died about six weeks later.

As to Bridges' previous conduct while on the train, the evidence is as follows:

Oney Kinley, colored, testifies that Bridges got on the train at Paris, Tennessee. He appeared to be drinking, but was not drunk. Bridges fired one shot from the train at Hilltop, Tennessee. When he fired the shot he put the pistol out the dindow and said that it was Christmas day, and he was going to celebrate. When he fired this shot, Bridges was on the west side. Bridges frequently moved from one side of the train to the other. All the passengers in the coach seemed to be talking, and Bridges was no noisier than the rest of them.

John Craven testified that he got on the train at Puryear. Between Puryear and Hazel, Bridges was whooping and "hollering" and cutting up and flourishing his pistol backwards and forwards all over the coach. Bridges appeared to be under the influence of whiskey, and his conduct was such that witness regarded him as dangerous. Between Puryear and Hazel, Juny Granberry, the porter, spoke to Bridges and told him he had better keep that thing (meaning the pistol) in his pocket; that it was liable to get him into trouble. At the time Granberry spoke to Bridges, Bridges had his pistol out in his hand. After this occurrence, Granberry, the porter, had sufficient time to hunt up the conductor of the train and speak to him before the train stopped at the Hazel depot. There were several others drinking and cutting up on the train. When the conductor passed through, they were cutting up and whooping and "hollering," some of them cursing and drinking. The aisle was full, and none of the negroes took their seats between Puryear and Hazel, although there were plenty of seats in the coach for them all. Some of them had their money out, and some of them had dice in their hands and proposed to shoot craps. The conductor had to crowd through them to take up the tickets. When the conductor passed through, he did not tell them to sit

down or keep quiet. When the train reached the depot at Hazel, Bridges had his head out the window "hollering" at people on the platform.

Ernest Oliver testifies that he got on the train at Puryear, Tennessee, and got off at Hazel, Kentucky. Saw Homer Bridges on the train. Bridges was cutting up. Appeared to be drunk. Was talking loud and "hollering" and walking up and down the aisle. The porter told him he had better put his pistol up, and sit down, or he would get into trouble. The porter's name was Juny Granberry. Several of the negroes were quarreling and fussing, and came near getting up a fight. Bridges and the rest of the boys kept up the fuss all the way from Puryear to Hazel. When Hazel was reached, Bridges stuck his head out the window and "hollered" to those who were leaving the train. Granberry, the porter, had plenty of time, after he spoke to Bridges about putting his pistol up, to hunt up the conductor and inform him of the conduct of Bridges.

The evidence for appellee further shows that Lowery was killed at a point about 1,600 feet north of the Hazel depot, and 131 feet north of the corporate limits of Hazel. The town of Hazel extends still further north of this place about 1,300 feet. The footpath along the railroad had been used daily for twelve or fifteen years by the public in general, and by school children in going to and from school.

The evidence for appellant is as follows:

M. C. Galloway, the conductor in charge of the train, testifies that he passed through the train four times between Paris and Hazel. The passengers in the colored compartment were not guilty of any rowdyism when he went through. They were just talking among themselves, and there was no extra noise going on. When he passed through the coach, no one had a pistol out, and he received no information of anyone having a pistol out between Paris and Hazel. He did not know of any firing of a pistol from the train between Paris and Hazel. Heard some pistol shots at stations and between stations, but not from train. Had no information that Homer Bridges was boisterously drunk. When he got on the train, he wasn't drunk, but had been drinking. After leaving Puryear, passed through the full length of the train. To go through the colored compartment occupied about 30 seconds. It is the duty of the porter to report to the conductor any misconduct that occurs on the train.

On leaving a station, it is the duty of the porter to go into the baggage and express car and assist the agent to stack the express and baggage. Did not know whether the porter was so occupied after leaving Puryear. Did not know what he was doing. There was nothing to prevent witness from expelling Bridges from the train at Hazel, had he received information between Puryear and Hazel that Bridges was acting in a boisterous and dangerous manner.

Gaston Poole, the official stenographer, who reported the evidence on the trial of Homer Bridges for murder, was introduced and read his notes showing that John Craven on that trial testified that before he got to Hazel, Homer Bridges was laughing and talking and going on, but that he never saw Bridges with any weapon.

Juny Granberry, the porter, testifies that he was in the colored compartment a part of the time between Paris and Hazel. Never saw any disorder on the train, and did not see anybody with a pistol. Saw Bridges when he got on the train, and his conduct was not different from that of others in the colored compartment. Never told Bridges between Puryear and Hazel that he had better keep that thing in his pocket; that it was liable to get him into trouble. Just after leaving Hazel, witness thought he heard a gun shot in the colored car. He then went into the car and asked who that was shooting. No one replied. He then said "whoever that is better put that pistol up." Before that time, he had not heard any pistol shot, or seen anyone with a pistol. On cross-examination, he stated that he didn't hear a shot at Hilltop. Had he gone into the car immediately after he had left Puryear, and seen Homer Bridges in a drunken, disorderly and riotous condition, and seen him waving a pistol about, he would have had time to communicate that fact to the conductor before the train left Hazel. Or if he had discovered such condition at any time between Puryear and Hazel, he could have told the conductor while the train was standing at the depot at Hazel.

Ada Wells testified that she got on the train at Paris, and went as far as Murray. Saw Homer Bridges on the train, and he was laughing and talking, and shot once at Hilltop, across a field toward a barn on the east side of the train. Did not see Bridges fire his pistol at any time except at Hilltop. No other pistol was fired upon

the train between Paris and Hazel. Bridges was laughing and talking, and doing nothing more than any of the other passengers. Bridges was riding first on one side of the train, and then on the other. When witness first saw his pistol, Bridges had it in his hand, and said it was Christmas, and he was having his fun.

The evidence further shows that the distance from Paris to Hilltop is about one and one-half miles. The distance from Hilltop to Puryear is eight or nine miles; from Puryear to Hazel, four miles, and from Hazel to Murray, seven to nine miles. The train left Paris shortly after eleven o'clock, and arrived at Murray about twelve o'clock.

For appellant it is insisted that the court erred in failing to award it a peremptory instruction, while for appellee it is insisted that a finding in its favor was proper not only because appellant violated section 806, Kentucky Stautes, by failing to eject Bridges from the train, or to turn him over to the peace officers at Hazel, but on the further ground that appellant owed to appellee, who was a licensee, the duty of exercising ordinary care to prevent his being injured, and that it failed in this duty when, with knowledge of Bridges' dangerous conduct, and of the serious consequences that might be reasonably anticipated to result therefrom, it made no effort to eject him from the train, or to restrain him in any way. Section 806, Kentucky Statutes, is as follows:

"If any person whilst riding on a passenger or other train, shall, in the hearing or presence of other passengers, and to their annoyance, use or utter obscene or profane language, or behave in a boisertous or riotous manner, or obtain, or attempt to obtain, money or property from any passenger by any game or device, he shall be fined for each offense not less than twenty-five nor more than one hundred dollars, or imprisoned in the county jail not less than ten nor more than fifty days, or both so fined and imprisoned; and it shall be the duty of the conductor in charge of any train upon which there is a person who has violated the provisions of this section either to put such person off the train, or to give notice of such violation to some peace officer at the first stopping place where any such officer may be."

It will be observed that the statute makes it an offense for any person, whilse riding on a passenger or other train, to use or utter obscene or profane language

in the hearing or presence of other passengers, to their annoyance, or to behave in a boisterous and rowdy manner, or to obtain or attempt to obtain money from any passenger by any game or device. In case of a violation of the statute by anyone, it is made the duty of the conductor to put such person off the train, or to give notice of such violations to some peace officer at the first stopping place where any such officer may be. In other words, the statute was enacted for the protection of passengers. Consequently, it is held that if a passenger is injured by the railroad company's failing to comply with its duties thereunder, a passenger may sue and recover.

That this was the plain purpose of the Legislature is further shown by the fact that a compliance with the statute on the part of the railroad company might result in an injury to a person not on the train; for, a person who was behaving in a boisterous and riotous manner might be ejected, and thereafter injure some one of the public, who would not have been injured had it not been for his ejection. We, therefore, conclude that a railroad company will not be liable to a third person not on the train for its violation of a statute which was not enacted for such person's benefit. Appellee insists, however, that the facts of this case bring it within the rule announced in Fletcher v. Baltimore & P. R. Co., 168 U. S., 135. The facts of that case were these: The railroad company had been in the daily habit for several years of running out of Washington and Alexandria a repair train of open flat cars, loaded with its employes. The train returned every evening about six o'clock, and brought the workmen back to their homes. These men were allowed the privilege of bringing back for their own individual use for firewood, old pieces of bridge timber, cross-ties, etc. It was the constant habit of the men to throw off these pieces of firewood while the train was in motion at such points on the road as were nearest to home, where the wood was picked up and carried off by some one of the members of the family, or by other persons waiting there for it. The plaintiff in the action was walking along the railway, and was struck by one of these pieces of wood. The trial court held there was no negligence on the part of the railroad company. In reversing the judgment, and holding that the question of negligence was one for the jury, the court, speaking through Mr. Justice Peckham, said:

"If the act on the car were such as to permit the jury to find that it was one from which, as a result, injury to a person on the street might reasonably be feared, and if acts of a like nature had been and were habitually performed by those upon the car to the knowledge of the agents or servants of the defendant, who with such knowledge permitted their continuance, then in such case the jury might find the defendant guilty of negligence in having permitted the act, and liable for the injury resulting therefrom, notwithstanding the act was that of an employe and beyond the scope of his employment and totally disconnected therewith. Knowledge on the part of the defendant, through its agents or servants, that passengers or employes upon its trains were in the habit of throwing out of the windows, newspapers or other light articles, not in their nature dangerous, would not render the company liable on the ground of negligence, although on some one occasion an individual might be injured by such act. The result in that case would be so unexpected, so extraordinary, and so unnatural, that a failure to prevent the custom could not be said to be negligence. But if a passenger upon a train, or an employe of the company upon one of its cars should supply himself with a quantity of stones for the purpose of throwing them off the train as it passed through a city, can it be possible that under such circumstances, if this intended use of the stones came to the knowledge of those who had the conduct of the train, it would not be their duty to prevent the act? And would it be any answer for the company, when charged with negligence in knowingly or negligently permitting such passenger or employe to throw the stones, to say that, the person throwing them was a passenger, or, if an employe, that he had completed his work for the day and was being transported to his home on the car of the company, and that the act was without the scope of his employment? Surely not. It is not a question of scope of employment or that the act of the individual is performed by one who has ceased for the time being to be in the employment of the company. The question is, does the company owe any duty whatever to the general public, or, in other words, to individuals who may be in the streets through which its railroad tracks are laid, to use reasonable diligence to see to it that those who are on its trains shall not be guilty or any act which might

reasonably be called dangerous and liable to result in injuries to persons on the street, where such act could by the exercise of reasonable diligence on the part of the company have been prevented? We think the company does owe such a duty, and if, through and in consequence of its neglect of that duty, an act is performed by a passenger or employe which is one of a series of the same kind of act and which the company had knowledge of and had acquiesced in, and if the act be in its nature a dangerous one, and a person lawfully on the street is injured as a result of such an act, the company is liable. Any other rule would in our opinion be most disastrous, and would be founded on no sound principle.''

It is not claimed that the facts of this case are at all similar to the case actually decided by the Supreme Court of the United States, but fall within the line of reasoning followed by that court in reaching its conclusion. It will be observed that the theory of liability for the act of the passenger in throwing stones from the window of the car and striking a person on the public roadway, is based on the fact that the stones were gathered for the purpose of throwing them off the train as it passed through the city, and that this intended use of the stones came to the knowledge of those who had the conduct of the train.

For the purpose of determining whether or not this line of reasoning applies to this case, and whether or not a peremptory should have gone, we must assume as true all the facts which the evidence tends to support. We find from the evidence that Bridges was drunk, and was acting in a boisterous manner. He fired his pistol from the window of the train. As both of the witnesses testifying to this fact—though one says that the shot was fired from the east side of the train, and the other says it was fired from the west side—state positively that only one shot was fired, it is manifest that two shots were not fired, and that they are simply mistaken as to which side of the train the shot was fired from. It is not shown that the porter, conductor, or any other employe of the train was present when or knew that this shot was fired. There is evidence, however, that between Puryear and Hazel, the porter told Bridges to put his pistol up. Hazel is only four miles from Puryear. It is not shown that Bridges failed to comply with the porter's injunction; but, on the contrary, there is no evidence that

Bridges had his pistol out at Hazel. This fact is further confirmed by the testimony of the witnesses who tell what occurred at the time Bridges shot Lowery. They all state that he took his pistol out of his pocket. The porter was not present when this occurred. Even had he been, it would have been impossible for him then to have reported the fact to the conductor in time to prevent the shooting. It does not appear that at the time the porter told Bridges to put his pistol up, Bridges was attempting in any way to injure anyone, or that his handling of the pistol was likely to result in injury. Therefore, when Bridges returned his pistol to his pocket, which he must have done, and was guilty of no further misconduct at Hazel than to halloa loudly to those leaving the train, we fail to see how it could have been reasonably contemplated from Bridges' conduct than unless put off the train or restrained in some way, he would perceive some one walking along the track, and deliberately shoot at him for the purpose of making him ''jump up.'' Had he, with the knowledge of those in charge of the train, been engaged in shooting from the train, or had his conduct been such as to indicate with reasonable certainty that he intended to shoot from the train, a different case would be presented. As it is, the record fails to disclose any series of acts on the part of Bridges, or any single act, committed in the presence of those in charge of the train, from which the intended use of the pistol could have been gathered, or from which it could have been reasonably apprehended that Bridges would be guilty of the malicious prank resulting in the death of Lowery. It must be remembered that railroads are not ordinarily held liable for the malicious acts of their passengers in injuring some one not on the train. We are, therefore, not inclined to extend the doctrine any further than anounced in Fletcher v. Baltimore & P. R. Co., supra. And in the absence of evidence tending to show that the intended use of the pistol by Bridges for the purpose of injuring some one was brought to the knowledge of those in charge of the train, we see no ground on which to base the claim that Lowery's death was due to the negligence of appellant in failing to rerstrain Bridges, or to eject him from the train. We, therefore, conclude that the trial court should have directed a verdict in favor of defendant.

Judgment reversed, and cause remanded with directions for new trial consistent with this opinion.