## Louisville and Nashville Railroad Company v. Phelps' Administrator.

(Decided October 22, 1918.)

### Appeal from Madison Circuit Court.

1. Carriers—Carrier of Passengers—Drunk or Disorderly Passengers—Right to Remove From One Coach to Another.—When a passenger, in a car occupied by ladies and children, is drunk or disorderly, the conductor, in place of stopping the train and ejecting the passenger, may remove him to another coach.

2. Carriers—Carrier of Passengers—Drunk or Disorderly Passengers—Right to Eject from Train.—Under section 806 of the Kentucky Statutes the conductor in charge of the train may eject from the train a passenger who is drunk or disorderly.

3. Carriers—Carrier of Passengers—Drunken Passengers—Care to be Taken of.—When a passenger is helpless or incapable of taking care of himself on account of intoxication, it is the duty of the carrier to exercise care to protect him from injury, but the mere fact that a passenger is drinking or under the influence of liquor is not enough to put upon train-men the extra duty of giving to him more care than to other passengers.

4 Carriers—Carrier of Passengers—Negligence—No Liability When Injury Could Not Have Been Reasonably Contemplated.—A defendant usually is not liable for negligence where no injurious consequences could have been reasonably contemplated as a result of the act or omission complained of. He is only liable where injury might have been anticipated or foreseen.

5. Negligence—Injury Caused by Unforeseen Accident.—Where the conductor assisted an intoxicated passenger to a seat and when he let go his arm the passenger staggered and fell against the window, injuring himself, there was no liability, as the conductor under the facts, could not have foreseen that injury would happen

on account of his failure to retain his hold of the passenger until he was carefully seated.

BURNAM & BURNAM, WALLACE & HARRIS and BENJAMIN D. WARFIELD for appellant.

ALLEN & DUNCAN, JOHN R. ALLEN and JOHN NOLAND for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

Thomas C. Phelps, while riding in what is known as the smoking car for white passengers, a car that was divided into compartments by partition in the middle, the front end being set apart for colored passengers, fell against the glass window in the car as he was about to take his seat near the window. In the fall his head went through the glass and broke it and jagged parts of the glass cut Phelps so badly about the face and throat that he died soon afterwards from loss of blood.

Afterwards this suit was brought by his administrator to recover damages upon the ground that the death of his intestate was caused by the negligence of the railroad company. More than one act of negligence was attempted to be made out in the evidence and is discussed in the brief of counsel for the administrator, but as the case went to the jury upon only one ground, which submitted the only act of negligence, if there was any that was at all made out in the evidence, we will confine this opinion to the facts and circumstances connected with it.

So treating the case, the negligence complained of consisted in the fact that the conductor of the train compelled Thomas C. Phelps, who was drunk and disorderly in the coach set apart for ladies as well as men, to remove from that coach to the one immediately in front of it known as the smoking car for white men; that when Thomas C. Phelps, with the assistance of the conductor, was taken from the ladies' coach to the smoking car, while the train was running at its regular speed, he was in such a state of intoxication as to be helpless and unable to take care of himself; that when he had been taken to a seat in the front end of the smoking car next to the partition that separated it from the compartment for colored persons, and while he was standing in the aisle, or at the end of the seat, but before he

had taken a seat, the conductor let go his arm that he had hold of at a time when the train was going around a curve in the track, and when the conductor let go of his arm he fell against the window, breaking the glass and receiving the injuries from which he died in the manner stated.

Turning now to the evidence, the first witness for the administrator was Boone Phelps, the brother of Thomas Phelps, who, after testifying that he and his brother, who was about fifty years old, got on the train at Nicholasville to go to Irvine, testified as follows: "Q. When you got to Nicholasville what was the condition of your brother with reference to drinking, or being drunk? A. He was pretty full; he was that way when we left home. Q. When you got to Nicholasville did all of you, or any of you, buy any tickets to Irvine? A. I bought tickets for all three of us. Q. What coach did you get in? A. We got in the second coach, in the front end. Q. The front end of the second coach? A. Yes, sir. Q. Do you recollect, with any certainty, as to which seat in the rear coach you got in? A. The first seat after you go in the door, on the left hand side. Q. On the left hand side entering? A. Yes, sir. Q. Now, Mr. Phelps, I will get you to tell the jury what took place between your crowd and the conductor with reference to requiring your brother to move into the front car; the smoking car. A. Well, he passed by several times and brother was talking rather loud, the door was open, and the rattle of the train and all, and the conductor passed us two or three times, and finally he come to us. There was a couple sitting right behind us that stopped him once as he went through, and then he come to my brother and told him, says, 'You will have to go to the other coach; you are talking too loud in here,' and caught hold of him and started to the other coach, and I got up and caught hold of him. Q. Which arm did the conductor take hold of him? A. The left arm, and I got hold of the other arm and started through between the coaches, and when we got out on the platform we hit a curve and come pretty near throwing us off, and the conductor took hold of me; grabbed me by the shoulder. Q. What was your condition then with reference to being intoxicated, or not? A. I only had a drink or two in me. Q. Your brother was full, how-

ever? A. Yes, sir. Q. Then what took place after that lurch occurred while on the platform? A. We goes into the smoker, and went up next to the partition that separates the smoker; the white part from the colored side, and started to sit down on a seat there, and the conductor and I both let loose of him as he started in between the seats, and about that time they went around a curve, and he went through the window. Q. What was the movement of the train at the time your brother was thrown through the window? A. They seemed to hit a sharp curve, and the train was running pretty fast and hit the curve and threw him right through the window. Q. What was the speed of the train? A. Well, they were running fast. Q. What is the condition of the road with reference to curves, and the condition; smooth running, or the contrary? A. It is pretty rough; lots of curves. Q. Had your brother even gotten seated at the time he was thrown toward that window? A. No, sir. Q. At what place was it that you and the conductor let go of him? A. At the end of the seat. Q. What was your position; your brother's and the conductor's and your own as you went up the aisle? A. Well, the conductor and my brother were a step or two ahead of me. Q. When the conductor took hold of your brother and told him he had to go in the other car, what part of him did he take hold of? A. He caught hold of his arm here (witness indicating). Q. Did your brother make any resistance to going that you know of? A. Well, no, he could not hardly go; he was pretty full. Q. What was his motion as he went along? A. Why he was like any other drunken man walking.''

George Teegarden, a witness for the administrator, said: ''Q. Which car were you in, Mr. Teegarden? A. I was in the smoking car. Q. What part of the smoking car were you sitting in? A. About half way down on the left hand side. Q. Did you see Mr. Phelps and the conductor when they came into that car? A. Yes, sir. Q. I wish you would go on and explain to the jury just what you saw and heard? A. I didn't pay much attention; they come in and kinder stopped right at the door, and then I looked around again and seen him and his brother coming down the aisle. There was not room for the three to walk side by side, and the conductor had his arm here (witness indicating). Q. What did he

do with him? A. Walked down until they come to the Jim Crow door, and he bulged there as they went in there. I don't know whether the conductor—I think he let go his arm—there was not room for him to go in there; he held to him as long as he could, and he made a kinder of a bulge, looked like, right through the window. Q. Went through the glass? A. Yes, sir. Q. Did you notice what the condition of the man was with reference to soberness, or the contrary? A. I think he was pretty well set up with whiskey. Q. When the conductor turned loose of his arm what took place then? That was about the time he made the bulge through the window? A. Yes, sir. Q. Now, Mr. Teegarden, when they come there opposite this seat where the accident occurred, did the conductor turn the man loose, or did he jerk loose? A. Could not say; there was not room for him to go in there, it was so narrow; I noticed he held on to him as long as he could. Q. The question I asked you was whether Mr. T. C. Phelps, the man who was injured, jerked loose or did the conductor turn him loose? A. I could not say; a man in his condition could not tell. Q. How far was his brother from him? A. Well, his brother had hold of his left arm coming down the aisle. Q. When did his brother turn loose of him? A. About the time he got half way into that seat where he was going.''

This was all the evidence introduced on behalf of the plaintiff.

For the railroad company, E. H. Ills, the conductor, said: ''I collected the ticket from Mr. Boone Phelps, and the other gentleman never was able to find any ticket, and he paid me cash fare. Q. How much? A. He gave me two one dollar bills, and I think the fare was $1.51 or $1.52. Q. Did you give him the change? A. I gave him the change. Q. Mr. Ills, tell the jury what the conduct of Mr. T. C. Phelps was on the train and in the ladies' car. A. Very bad. Q. Well, without conclusions, tell what he did. A. Well, sir, I approached Mr. Phelps and asked him for his ticket, and his brother handed me a ticket, and he says 'I have a ticket somewhere.' Well, I asked him to give me his ticket, and asked him where he went, and he says, 'by God,' said 'I know where I am going.' I told him 'that was all right, to give me his ticket so I could tell where he was going.' He felt in his pocket there, for I reckon, ten

or fifteen seconds, or maybe a minute, and he didn't find
it, and he pulled out some money and handed to me
two one dollar bills. I gave him his change, and he got
to cursing; 'by God, he had money enough to pay his
way anywhere he went; that he didn't impose on nobody,
or didn't aim to impose on nobody, and didn't aim to be
imposed on.' I told him that was unnecessary, having
that kind of talk in the ladies' car; that we could not have
it, and I asked him not to use that kind of language.
He says, 'all right.' He was cursing again, and there
were some ladies sitting close, and I asked him not to
use that kind of language; that there were some ladies
in there, and we didn't care to hear it, and it was all
unnecessary, and his brother spoke up and says: 'It is
all right; I will take care of him.' I told him we could
not have that in the car at all; we would have to stop
that, and he hushed up then, and I went on out into the
other coach. There was some lady got on the train,
kinder an old lady, and she passed by him, and he says
to her, 'Come and set down in my lap; come and set
down here,' and he patted his lap that way (witness in-
dicating). I turned and goes on up into the smoking
department and then I come on back through the train,
and he was still cursing and going on, and I called his
attention again to it; told him we could not allow it;
if he didn't stop we would have to make some different
arrangements; would either have to stop the train and
put him off, or put him in the other car. He lowed then
he was all right, says: 'I am all right; I don't mean no
harm,' and says, 'By God, I have paid my fare and I
have got a right to go where I please.' I asked his
brother again, 'Can't you keep him quiet?' and he says,
'He will get all right directly; he will go to sleep.' After
I got through working the train and collecting the fares
I come on back through the train, and I called his atten-
tion again about cursing, and he had kinder reared
back in his seat, and had placed his foot that way (wit-
ness indicating) on the back of the next seat; had put
his left foot up at the side of a gentleman's face, a pas-
senger, who was sitting there. I asked him to remove
his foot; that that was not any place to put his foot;
that was a seat for people's backs to lean up against,
and was not for a foot stool. He says, 'By God, that
foot is not hurting anybody.' I went on back through

my train, and he quieted down, and I went on, and while I was gone back in there he commenced cursing again—then I come back to him again as I was coming out through the train, and I asked his brother to get up and take him into the smoker; that we could not have that in there. And his brother got up and got his hat and got a bundle, or something in the hat rack, and I went to the door and taken hold of his arm—Mr. Boone Phelps was holding to one arm and I had hold of the other one. He got up to the door there and I taken hold of him and helped him along through the aisle and we got over to the space between the coaches. I assisted him across the coach and held to him, and as he went over to the door, Mr. Boone Phelps, on account of the narrow space through there not being wide enough for all to go through, he turns him loose, and I taken him into coach and set him down in the first seat on the left side as you go into the door, and then Mr. Boone Phelps come on into the car and stood up there by the side of him. Q. Then what did you do? A. I turned and come back to close my doors that I had left open when we had come across. He got up from back here where I had seated him down at; where I first seated him, and comes up through the aisle to another seat, and when he got up there as he went to sit down—his brother had hold of him—hold of his arm, and he turned him loose, and his head kinder pitched over to the window glass and broke the glass in the window. Q. Now. Mr. Ills, after you set Mr. Phelps down in the seat in the smoking car did you after that time direct, or order him, or require him to change his place in the car? A. No, sir; I advised his brother and him both for him to stay in that corner seat I had seated him down in. Q. After you seated him down in this seat in the smoking car did you have hold of him any more after that? A. No, sir; never had my hands on him, and never was closer than five feet any other time until he was hurt. Q. You say he was drinking? A. Yes, sir. Q. You looked at him? A. Yes, sir, when I collected his ticket. Q. I thought you didn't collect his ticket? A. His cash fare. Q. You say he was drinking? A. Yes, sir. Q. It never occurred to you that he was drunk? A. He was drinking. Q. But, I say, 'drunk?' A. I don't say he was drunk. He was drinking, but was not incapable of taking care of himself? Q. You think a man is capable of taking care

of himself if he can sit in a seat? A. He was walking along. Q. What was he doing? A. Swearing and cursing; using vulgar talk. Q. You walked up to him a second time and told him to keep quiet? A. Several times. Q. Was he drunk then at that time—you say he was getting drunker? A. No, sir.''

For the railroad company W. M. Lowry, another witness, said: ''What part of the train were you riding in? A. In the smoking car. Q. What first attracted your attention to the fact Mr. Phelps was in the car? A. The first I knowed of it some man, who I didn't know to be Mr. Phelps, but learned afterwards, put his hand on my left shoulder. Q. Where was the gentleman at that time? A. He was walking up the aisle. Q. How; by himself, or some one with him? A. There was another man behind him. Q. Did you ascertain, or find out who that man was? A. They said it was his brother. Q. Where was the conductor at that time, if you know? A. I don't know. Q. What become of this gentleman that put his hand on your shoulder; did he go forward, or stop, or turn and go back? A. He went forward. Q. His brother still with him? A. Yes, sir. Q. Have hold of him? A. I don't know that he really had hold of him until he got almost up to where they set down. Q. Tell the jury, Mr. Lowry, what you saw occur there from the time this man put his hand on your shoulder until the accident happened? A. Well, I just simply looked around at him and saw the man going, and of course, they were only about three seats, I suppose, from where I was to where they went. I noticed this man; he was not holding him very strong; he might have had his hand just a little bit on his right arm, and taken him on to the front of the car, and started to sit down on the left hand side, and then I heard a crash through the window and looked up and the man's head, or rather his neck, was up against the window glass. Q. When did you see the conductor? A. Behind him. Q. Did he have hold of this man? A. No, sir; he stopped in the aisle right opposite where they were sitting, down at the end of the car, at the double seat.''

C. A. Moores, another witness for the railroad company, said: ''Q. Did you see Mr. Phelps when he same into the car; into the smoking car? A. Well, I saw

him, yes, sir. Q. Who was with him? A. Well, the conductor and Mr. Boone Phelps, I suppose it was, with him. Q. Where did they go when they first came into the car? A. When they first came into the car they didn't go anywhere. One of them set down. I don't remember whether the other one did or not. Q. Which was the one that sat down? A. The one that got hurt. Q. Where did he sit down; what seat? A. The front seat, I believe. Q. When you say the front seat do you mean the seat toward the negro compartment, or towards the ladies' car? A. The seat towards the ladies' car; that is, the seat next to the door. Q. Did you see Mr. Phelps when he got up from this seat? A. Yes, sir. Q. Did you hear him say anything when he got up? A. Well, he was talking all along; I don't know whether he said anything just when he got up or not? Q. When he got up what did he do? A. He come back towards the front end of the car. Q. Who was with him at that time? A. Well, Mr. Boone Phelps, I suppose it was with him. Q. With his brother? A. Yes, sir. Q. Did Mr. Boone Phelps have hold of him or not? A. I think he did; yes, sir, I think he had hold of him. Q. Where did they go to? A. They come on up near the partition between the colored car and the smoker. Q. Tell just what you saw, if you saw anything? A. Well, he went to sit down, and he never did get in his seat, I don't think, until he fell through the window. Q. At the time he attempted to sit down did his brother have hold of him, or had he turned him loose? A. His brother had turned loose of him then. Q. How did he come? A. He walked. Q. Was he staggering? A. Well, to some extent, yes, sir. Q. Did he walk right straight on up to that seat? A. Well, he was sorter staggering and coming on up there; never did stop any place very long at a time. Q. As he went on up there to the front where was his brother, Boone Phelps? A. He was with him all the time. Q. Did he have hold of him. A. Yes, sir, I guess he had hold of him. Q. Where was the conductor? A. Not there at that time.''

Claud Neal, a witness for the railroad company, said: ''Q. What part of the train were you on? A. In the smoker. Q. Where was he the first time you noticed him? A. He was on the first seat, to the left, the way the train was running. Q. In the smoking compartment? A. Yes, sir. Q. Was he seated in there? A. Yes, sir.

Q. Was his brother with him? A. Well, I didn't see his brother. Q. Was anybody there with him at that time? A. I don't think there was anybody on the seat with him; I don't think there was. Q. After you saw him there what did he do? A. Well, he was not doing anything there; just sitting there. Q. Did he continue to sit there, or did he get up? A. I don't know whether he got up, or was taken up, or what; the first I saw of him he was going up the aisle, and the conductor and the man that was said to be his brother were with him. Q. Now, where were they in the aisle at that time? A. Well, they were back pretty close to the door, something half way between, something near the middle ways. Q. Did his brother have hold of him? A. I think he did. Q. Which direction coming from—the front end of the smoking compartment? A. Yes, sir. Q. Did they come on down to the front part of that car? A. Yes, sir. Q. What happened there? A. Well, he started to sit down and fell through the window. Q. Just before he started, or at the time he started to sit down, did his brother have hold of him? A. I don't think he did. Q. Had he had hold of him before that? A. Yes, sir. Q. Where was the conductor at that time? A. Well, he was right back of him. Q. Right back of which Mr. Phelps? A. Of the one that got hurt. Q. Did he have hold of him? A. I don't think he did.''

R. W. Isaacs, J. W. Tucker, Lee Thompson, Hampton Pendleton and Keel Roberts, other passengers in the smoking car, testified substantially to the same facts as Moores and Neal.

This evidence shows very clearly that Thomas J. Phelps was disorderly, insulting and offensive to the ladies and other passengers in the ladies' car, and therefore the conductor was entirely within his rights in removing him from the car to the smoking car, occupied only by a few men, although there is some contention on the part of counsel for the administrator that the duty of the conductor was, under the circumstances, to stop the train and eject Phelps if he was drunk and disorderly.

We think, however, the conductor, under the facts, might have stopped the train and ejected Phelps without subjecting the company to any liability for his conduct in so doing, assuming, of course, that there was no cir-

circumstance connected with the ejection that would impose liability upon the company. This right of ejection is authorized by section 806 of the Kentucky Statutes, reading in part: "If any person, whilst riding on a passenger or other train, shall, in the hearing or presence of other passengers, and to their annoyance, use or utter obscene or profane language, or behave in a boisterous or riotous manner . . . it shall be the duty of the conductor in charge of any train upon which there is a person who has violated the provisions of this section either to put such person off the train, or to give notice of such violation to some peace officer, at the first stopping place where any such officer may be." Construing this statute reference may be had to the cases of the C. & O. Railway Co. v. Crank, 128 Ky. 329; Commonwealth v. Marcum, 135 Ky. 1; N. C. & St. L. Railway Co. v. Lowery's Admr., 148 Ky. 599; C. & O. Railway Co. v. Pruitt, 157 Ky. 133; Louisville & Nashville Railroad Co. v. Bell, 166 Ky. 400.

But we are also of the opinion that when a passenger in a car occupied by ladies and children is drunk or disorderly or insulting or offensive to the passengers or any of them in the car in which he is riding the conductor, in place of stopping the train and ejecting the passenger, may, in the exercise of ordinary care for the safety of the offending passenger, require him to remove to another coach where his conduct may not be offensive or objectionable to the passengers riding therein.

Having this view of the matter we will now consider the question whether the conductor was guilty of negligence in anything he did in connection with the removal of Phelps from one car to the other and particularly in what he did at the time Phelps was taken to the seat at which he fell through the car window.

In determining this question it is important to ascertain what state of intoxication Phelps was in, or, in other words, whether he was so intoxicated as to be helpless or incapable of taking care of himself, or only so much under the influence of liquor as to be disorderly, offensive and insulting.

There is, of course, no room for doubt that Phelps was under the influence of liquor, but from a careful consideration of the whole evidence, our opinion is that he was not so helpless or incapable of taking care of

himself as to put on the conductor the exercise of that degree of care that would have been required if he had been helpless or incapable of taking care of himself. He was noisy, disorderly, offensive and insulting, as a great many drunken men are, but a man under the influence of liquor might do any or all of these annoying and objectionable things and yet be capable of taking care of himself to such an extent as not to put on the conductor or trainman the duty of looking after his safety.

The law applicable to a case like this was declared by this court in L. H. & St. L. Ry. Co. v. Gregory's Admr., 141 Ky. 747, where the court said: "It is the duty of the train employees to look after the safety and comfort of all the passengers, and they are not required to extend to one more protection or care than another, except under special circumstances. And the mere fact that a passenger is drinking or under the influence of liquor is not enough to put upon trainmen the extra duty of giving to him more care than to other passengers. This measure of duty is only demanded when the condition of the passenger is such that he is helpless or incapable of taking care of himself. If a passenger, on account of intoxication that does not produce helplessness or incapacity, is rendered less capable of protecting himself from accident or injury than he otherwise would be or his condition induced him to become more indifferent to his safety, he must take the consequences of his own recklessness, and the company will not be charged with the duty of taking especial care of him. His right to recover is no greater than would be that of a sober person of ordinary prudence."

To the same effect is L. & N. R. R. Co. v. Mudd's Admrx., 173 Ky. 330. Other pertinent cases are L. & N. R. R. Co. v. Logan, 88 Ky. 232; L. & N. R. R. Co. v. Deason, 29 Ky. Law Rep., 1259; Thixton's Exr. v. I. C. R. R. Co., 29 Ky. Law Rep. 910; L. & N. R. R. Co. v. Johnson, 168 Ky. 351.

Applying now to the facts of this case the principles of law set down in the Gregory case and adopted in the Mudd case we are of the opinion that Phelps was not so helpless or incapable of taking care of himself as to make it incumbent upon the conductor to see that he was carefully seated in the smoking car. The great weight of the evidence, almost entirely by disinterested wit-

nesses, who happened to be passengers in the smoking car, shows very clearly that when the conductor escorted or assisted Phelps from the ladies' car to the smoking car he left him seated in the first seat inside the door and that after the conductor had left, Phelps and his brother went voluntarily from this seat through the car to the seat next to the partition, and that the conductor, although close behind them at this time, did not have hold of Phelps when he undertook to take the seat from which he fell through the window. But looking at the case as it is presented by the evidence of Boone Phelps and Teegarden, and assuming that the conductor did have hold of the arm of Phelps and let him go while he was standing preparatory to taking the seat, his condition was not such as to put on the conductor the duty of retaining his hold of him until he was carefully seated.

If Phelps had been wholly incapable of taking care of himself or in such a helpless condition as that he could not have taken the seat without assistance it might well be said that the conductor would have been under a duty not to have left him or loosened his hold of him until he had been seated, but as he was not in this condition the conductor did not owe him that high degree of care that would have been required in looking after a passenger who was helpless or incapable of taking care of himself.

In the condition that Phelps was the conductor was not required to do more than the evidence shows he did, which was to take him to the seat and to a position where he could have taken the seat with safety to himself.

Under the circumstances the conductor was not under a duty to anticipate that what happened to Phelps would happen nor was he lacking in ordinary care in doing what he did do or in failing to do anything. If the conductor, in the exercise of ordinary care, could have anticipated or foreseen that what happened would happen he would, of course, have been under a duty to have exercised ordinary care to have prevented its happening, although Phelps may not have been in such a helpless condition as to impose on the conductor the duty of looking after his safety. But it is a general rule of negligence law that where a person is not under a duty to do a prescribed thing he is not liable in negli-

gence for an injury that may happen because he did not take the pains to foresee and prevent it.

Thus it was said in Gosney v. L. & N. R. R. Co., 169 Ky. 323, supported by abundant authority that: "A defendant usually is not liable for negligence where no injurious consequences could reasonably have been contemplated as the result of the act or omission complained of; he is liable only where injuries might have been anticipated, or foreseen. A person is expected to anticipate and guard against all reasonable consequences; but he is not expected to anticipate or guard against those which no reasonable man would expect to occur."

Now assuming as we do that Phelps was drinking, disorderly and offensive, but yet not helpless or incapable of taking care of himself, we think it plain that the conductor in the exercise of a reasonable judgment could not have anticipated that Phelps would be injured in the way that he was.

We are, therefore, of the opinion that the court erred in failing to give the peremptory instruction requested, and the judgment is reversed, with directions, if there is a retrial and the evidence is substantially the same as appears in this record, to take the case from the jury.

Whole court sitting.