## Louisville & N. R. Co. v. Barnes' Adm'x.

Feb. 8, 1944.

H. T. Lively, Jouett & Metcalf, C. S. Landrum and C. E. Rice, Jr., for appellant.

Rodney Haggard and D. L. Pendleton for appellee.

OPINION OF THE COURT BY JUDGE RATLIFF—Reversing.

This appeal is from a judgment of the Clark circuit court rendered upon a jury's verdict for $7,500 in favor of appellee, administratrix of the estate of Roy Barnes, who was killed by appellant's freight train at Agawam, Clark county, Kentucky, in the early morning hours of August 17, 1941. About one hour before the accident occurred decedent had arrived at Agawam Station on appellant's passenger train from Winchester, Kentucky. The exact distance in miles between

Winchester and Agawam is not shown but it is stated in the record that it is about a fifteen minutes run by train. The action is based upon the alleged negligence of appellant's agents and employees in charge of the passenger train and the freight train, respectively, as follows: "The plaintiff further says that about midnight of August 16, 1941, or in the early part of the morning of August 17, 1941, the defendant, through its agents, servants, and employees, accepted said Roy Barnes as a passenger to travel from Winchester to Agawam Station in Clark County, Kentucky; that when said Barnes was so accepted as a passenger he was under the influence of intoxicants and incapable of caring for himself, and while in that condition which condition of the decedent was known by the defendant, through its servants, agents and employees in charge of the train upon which said decedent was a passenger, or by the exercise of ordinary care could have been discovered by said servants, agents and employees in charge of said train, the defendant, through its employees, carelessly, with gross negligence and with wanton and reckless disregard for the rights and safety of said decedent, permitted said decedent to leave its train and abandoned him at Agawam Station, on the defendant's right-of-way, a known place of danger and a place where the defendant, through its servants, agents and employees, knew that said decedent would likely suffer injury; that a short time after decedent had been so left by the defendant, through its servants, agents and employees, and while the said decedent was on one of the three tracks, or roadbeds, of the defendant at said Agawam Station on August 17, 1941, the defendant by and through its servants, agents, and employees, carelessly, with gross negligence and with wanton and reckless disregard of the rights of said decedent, ran one of its engines and train of cars into, against and over the body of said decedent and inflicted such injuries upon his body, that he died within a few hours thereafter."

Appellant filed a general demurrer to the petition, which demurrer the court overruled. The answer consisted of a traverse and plea of contributory negligence. The first ground relied on for reversal is that the petition fails to state a cause of action. The argument is that the petition was defective in that it merely stated that decedent was under the influence of intoxicants and

incapable of caring for himself, but did not allege that he was in such a state of intoxication that he was helpless or irresponsible, nor that he was incapable of caring for himself by reason of being under the influence of intoxicants. It is to be noted that the language ''that when said Barnes was so accepted as a passenger he was under the influence of intoxicants and incapable of caring for himself'' is immediately followed with the further language ''and while in that condition, which condition of the decedent was known by the defendant,'' he was permitted to leave the train, etc. While it is not stated in exact language that decedent was incapable of caring for himself because of being in an intoxicated condition, yet we think that the allegations are equivalent to that statement or mean the same. The phrase ''while in that condition,'' evidently has reference to his intoxicated condition. Furthermore, there is a general allegation that the decedent was run over by appellant's freight train through and by the negligence and carelessness of the agents and employees of appellant. We think the court properly overruled the demurrer to the petition.

It is next argued that appellant's motion for a peremptory instruction should have been sustained because appellant was not guilty of negligence in permitting the decedent to leave the passenger train at Agawam Station, or, that it failed to discharge any legal duty it owed to him as a passenger. This calls for a review of the evidence. John Dyer testified that he saw the deceased at a restaurant in Winchester about thirty or forty minutes before train time, or about 11:30 p. m., and that he was drunk or was staggering and talking like a drunk man; a few minutes after 12 o'clock he saw decedent at the station where he got on the train and that he was staggering ''a right smart.'' He asked decedent if he wanted to go out home and decedent said ''I've got my ticket bought,'' and the conductor of the passenger train, who was present, put his hand on his shoulder and said ''I will take care of you.'' The decedent then walked up the steps onto the train.

Claudie Bush, who rode the passenger train from Winchester to Agawam, testified that he got off the train at the station where the highway crosses the tracks and he saw a man, whom he did not recognize at night, get off the train on the same side he got off back about 35 or

40 feet and the man was "kindly staggering." He said this man went towards the Ragland gate, which was on the east side of the railroad tracks near the location of Charley Todd's residence, for whom decedent had been working; he then turned and came back toward the Agawam tunnel which was slightly north of the point where he got off the train, or back toward Winchester. While Bush did not identify the man as being the decedent, yet both parties argue their respective sides of the case upon the theory that the man whom Bush saw get off the train was the decedent. This was the last that was seen of the decedent, so far as the record discloses, until after he was run over by the freight train moving in an opposite direction from the passenger train an hour or more later.

No member of either train crew, passenger or freight, testified in the case and there is no evidence as to how the accident happened. Gip Abney, a section laborer for appellant, who lived in a section house about one mile south of Agawam Station, testified that on the morning of August 17 he was called by some one to come to Agawam Station; he got on an engine and went to Agawam and learned that a man had been killed and he saw decedent lying length-wise on the tract between the rails under the train and one leg was cut or pulled off; that he was still alive but never regained consciousness or spoke. He said they cut the north section of the train and pulled it up the track and then pulled the car under which decedent was lying from over his body. It is argued in brief for appellee that the conduct of appellant in pulling the car over decedent's body was an act of negligence which might have inflicted further injuries on him resulting in his death. But there is no evidence to show that additional or further injuries were inflicted on decedent by pulling the car over his body, nor could the jury have found for appellee on that phase of the case because the only question of negligence submitted to the jury was in respect to the intoxicated condition of decedent and the duty the passenger train employees owed to him and the contributory negligence of the decedent, and the case was submitted to the jury upon those issues only.

It is the established rule that it is only when the intoxication of a passenger is such as to render him helpless or incapable of taking care of himself that extra care is demanded from the trainmen to prevent injuries

to him, but the mere fact that a passenger is drinking or under the influence of intoxicants is not enough to put upon the trainmen the extra duty of giving him more care than to other passengers. Louisville & N. R. Co. v. Mudd's Adm'x, 173 Ky. 330, 191 S. W. 102; Louisville & N. R. Co. v. Phelps' Adm'r, 181 Ky. 689, 205 S. W. 793; Louisville, H. & St. L. R. Co. v. Gregory's Adm'r, 141 Ky. 747, 133 S. W. 805, 35 L. R. A., N. S., 317; 28 C. J. S. Drunkards, Sec. 1, page 541. Many other authorities of a like nature might be cited but so far as we know there is no authority contrary to the principles enunciated in the cases supra, and hence the citation of cumulative authorities would serve no useful purpose. In the Mudd case it was alleged in the petition that at the time of the accident and all the time Mudd was upon appellant's passenger train he was in a helpless condition and incapable of taking care of himself or of discerning, apprehending and preventing danger and injury to himself, and that his condition was known, or could have been known, by the exercise of ordinary care by the employees and agents in charge of the train, and that they negligently permitted him, while in an intoxicated condition, to leave the car on the train and fall therefrom, thereby producing the injuries which resulted in his death. The train upon which Mudd was traveling left Louisville at about 5 o'clock p. m. and was due to arrive at Loretto Station at about 7:40 the same evening. As the train was approaching Loretto, and after the flagman had announced in the car in which Mudd was riding, "Loretto," or "Loretto is the next stop," Mudd got up from his seat and walked out of the car upon the platform and either fell from the car or jumped off while the train was going thirty or thirty-five miles an hour, resulting in injuries from which he later died. It was shown in the evidence in that case that before boarding the train at the Union Depot on Broadway in Louisville, on the way to the depot Mudd and his son, L. E. Mudd, and other companions stopped in about a half dozen saloons, in each of which the decedent Mudd drank beer and also had a half pint bottle of whisky out of which he and his companions each took a drink in the lavatory before they got on the train. Two of Mudd's companions, one upon either side of him, helped him to mount the steps and to a seat on the train where they left him about ten or fifteen minutes before the time for the train to leave the station. His son, L. E. Mudd, as he left the train,

said to the flagman: "The old gentleman is drinking considerably, I wish you would see that he gets off at Loretto Station." After Mudd jumped or fell off the train near Loretto Station, two men went along the track until they found him lying near the track with his coat over his head, apparently dead, but when they pulled the coat from over his head he cursed them and used insulting and abusive language, and said: "Let me alone, let me die right here." They put him in the baggage car and took him to a store where a doctor dressed his wounds and he kept cursing while the wounds were being dressed. Another witness who described the scene and the conduct of Mudd at the place where they picked him up where he had left the train, said that he was "very drunk and had the smell of whiskey all over him." The court held that the evidence fell far short of establishing the fact that while on the train Mudd was in such a state of intoxication as to render him helpless or incapable of taking care of himself and did not tend to prove that his condition was such that the trainmen should have anticipated that when his station was announced he would immediately get up and get off the train while it was running at a rapid rate of speed, and that the court erred in overruling the defendant's motion for a peremptory instruction at the conclusion of the plaintiff's evidence, and again after all the evidence on both sides was in.

In the Phelps case, supra, Thomas C. Phelps, the plaintiff in that action, and his brother and another man, boarded the train at Nicholasville, Kentucky, for Irvine, Kentucky. It appears from the evidence as set out in that opinion that Phelps was considerably intoxicated when they boarded the train and became so disorderly that the conductor had to eject him from the car which he entered and took him to another car. Phelps' brother, who testified for the plaintiff, when asked about his brother's condition with respect to being intoxicated, said [181 Ky. 689, 205 S. W. 794]: "He could not hardly go; he was pretty full." He was asked: "What was his motion as he went along? A. Why he was like any other drunken man walking," indicating that he was staggering or unsteady. When the conductor asked Phelps to give him his ticket and asked him where he was going, he said: "By God, * * * I know where I am going." The conductor told him that that was all right but to give him his ticket so he could know where he was go-

ing, and he felt in his pocket for awhile but failed to find the ticket and took out some money and paid cash fare. The conductor, further testifying, said: " '* * * I gave him his change, and he got to cursing, "by God, he had money enough to pay his way anywhere he went; that he didn't impose on nobody, or didn't aim to impose on nobody, and didn't aim to be imposed on." I told him that was unnecessary, having that kind of talk in the ladies' car; that we could not have it, and I asked him not to use that kind of language. He says, "All right." He was cursing again, and there were some ladies sitting close, and I asked him not to use that kind of language; that there were some ladies in there and we didn't care to hear it, and it was all unnecessary, and his brother spoke up and says, "It is all right; I will take care of him." I told him we could not have that in the car at all; we would have to stop that; and he hushed up then, and I went on out into the other coach. There was some lady got on the train, kinder an old lady, and she passed by him, and he says, to her, "Come and set down in my lap; come and set down here;" and he patted his lap that way (witness indicating). I turned and goes on up into the smoking department, and then I come on back through the train, and he was still cursing and going on, and I called his attention again to it, told him we could not allow it; if he didn't stop we would have to make some different arrangements, would either have to stop the train and put him off, or put him in the other car. He 'lowed then he was all right, says: "I am all right; I don't mean no harm," and says, "By God, I have paid my fare, and I have got a right to go where I please." I asked his brother again, "Can't you keep him quiet?" and he says, "He will get all right directly; he will go to sleep." After I got through working the train and collecting the fares, I come on back through the train, and I called his attention again about cursing, and he had kinder reared back in his seat, and had placed his foot that way (witness indicating) on the back of the next seat, had put his left foot up at the side of a gentleman's face, a passenger, who was sitting there. I asked him to remove his foot, that that was not any place to put his foot; that was a seat for people's backs to lean up against, and was not for a foot stool. He says, "By God, that foot is not hurting anybody." ' "

Later on in the conductor's testimony he said that Phelps' conduct became such that he and Phelps' brother

took him to another coach or car. After reviewing the evidence, the court said: "There is, of course, no room for doubt that Phelps was under the influence of liquor; but, from a careful consideration of the whole evidence, our opinion is that he was not so helpless or incapable of taking care of himself as to put on the conductor the exercise of that degree of care that would have been required if he had been helpless or incapable of taking care of himself. He was noisy, disorderly, offensive, and insulting, as a great many drunken men are; but a man under the influence of liquor might do any or all of these annoying and objectionable things, and yet be capable of taking care of himself to such an extent as not to put on the conductor or trainman the duty of looking after his safety.

"The law applicable to a case like this was declared by this court in Louisville, H. & St. L. R. Co. v. Gregory's Adm'r, 141 Ky. 747, 133 S. W. 805, 35 L. R. A., N. S., 317, where the court said: 'It is the duty of the train employes to look after the safety and comfort of all the passengers, and they are not required to extend to one more protection or care than another, except under special circumstances. And the mere fact that a passenger is drinking or under the influence of liquor is not enough to put upon trainmen the extra duty of giving to him more care than to other passengers. This measure of duty is only demanded when the condition of the passenger is such that he is helpless or incapable of taking care of himself. If a passenger, on account of intoxication that does not produce helplessness or incapacity, is rendered less capable of protecting himself from accident or injury than he otherwise would be or his condition induced him to become more indifferent to his safety, he must take the consequences of his own recklessness, and the company will not be charged with the duty of taking especial care of him. His right to recover is no greater than would be that of a sober person of ordinary prudence.' "

The Gregory case is like or similar to the other two cases, supra, with respect to the degree of intoxication of the plaintiffs in those respective actions, and the court held that the company was not guilty of negligence or responsible for the accident resulting in Gregory's death and that his death was solely due to his own carelessness or negligence.

In the case at bar, the only evidence as to the decedent's state of intoxication was that he was staggering when he appeared on the platform at Winchester and also when he got off the train at Agawam. It is shown by the evidence of Dyer, who saw decedent board the train at Winchester, that he walked up the steps onto the train unassisted and, according to the evidence of Claudie Bush, he got off the train at Agawam unassisted, though staggering, and started toward the Ragland gate which was in the direction of the home of Charley Todd, for whom he was working. He had sufficient presence of mind and intelligence while at Winchester to purchase his ticket to Agawam, the place he desired to go, and also knew when he reached Agawam Station. There is no evidence of any misconduct or any indications of a high degree of intoxication, or that his state of intoxication was such that he required assistance in any respect. The mere fact that a man under the influence of intoxicants may stagger is not evidence of such a degree of intoxication as ordinarily would render him helpless or incapable of caring for himself. It is commonly known that a moderate degree of intoxication may cause some people to stagger but at the same time have their presence of mind and be mentally capable of caring for themselves.

It is insisted for appellee that decedent was permitted to get off the train at Agawam at a dangerous place. However, we find no evidence tending to show that the place where he got off the train was dangerous or unsafe in any respect. He got off on the platform prepared for that purpose and where other passengers got off. It is said that there are deep ditches, embankments, etc., bordering or near appellant company's right of way near Agawam Station but it is not shown that such embankments or ditches are on the right of way, but on the contrary they are off the right of way, a condition which is not under the control of appellant company. Decedent lived near Agawam Station and was acquainted with the terrain surrounding the company's tracks at that place. We think the evidence falls short of establishing that decedent was in such a state of intoxication as to render him helpless or incapable of taking care of himself and did not tend to prove that his condition was such that the trainmen should have anticipated that after he got off the train on the platform in a place of safety he would go onto the railroad tracks and be run

626

over by a train passing later in the night. It is not shown that any other train was on the side tracks or approaching that station at the time decedent got off, or any condition which imposed upon the company the duty of furnishing him a guard to guide or direct him beyond the railroad premises. It may be true that his state of intoxication rendered him less capable of protecting himself from accident or injury than he otherwise would be, yet, as said in the Mudd case, he must take the consequences of his own recklessness and the company will not be charged with the duty of taking especial care of him. It is our conclusion, therefore, that the evidence fails to show any breach of duty or negligence on the part of appellant's employees in charge of the train and the court should have sustained appellant's motion for a directed verdict in its favor. These conclusions make it unnecessary for us to pass upon other questions raised, all of which are reserved.

Wherefore, the judgment is reversed and remanded for proceedings consistent with this opinion.